STATE OF CONNECTICUT *v.* CHRISTOPHER BUTLER
(SC 18466)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued February 9—officially released May 4, 2010

*John R. Williams,* for the appellant (defendant).

*Harry Weller,* senior assistant state's attorney, with whom were *John P. Doyle, Jr.,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Christopher Butler, appeals[1] from the trial court's judgment of conviction, following a jury trial, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b).[2] On appeal, the defen-

[1] The defendant appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years or more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended, except the court may suspend the execution

dant first claims that the trial court, *Damiani, J.*, improperly denied his motion to suppress narcotics seized from the automobile he was driving incident to a routine traffic stop because the seizure of the narcotics violated his fourth amendment rights pursuant to *Arizona* v. *Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). The defendant also claims that the trial court, *Vitale, J.*, improperly denied his motion for acquittal of the charge of possession with intent to sell on the ground that the state had failed to prove beyond a reasonable doubt that the defendant was in possession of the seized narcotics. With respect to the first claim, we conclude that, because the defendant was not arrested at the time of the search and seizure, *Gant* does not control in this case and that the search complied with the applicable requirements for protective searches of automobiles established in *Michigan* v. *Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). With respect to the second claim, we conclude that the state presented adequate evidence from which the jury reasonably could have concluded that the defendant had constructive possession of the narcotics. Accordingly, we affirm the trial court's judgment.

The record reveals the following facts, which the jury reasonably could have found. On April 1, 2006, Officers Craig Miller, David Rivera and Charles Gargano of the New Haven police department were patrolling the Fair Haven neighborhood as part of their duties with that city's drug interdiction unit. The neighborhood was known for frequent drug trafficking activity. The offi-

---

of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years, or (2) such person's mental capacity was significantly impaired, but not so impaired as to constitute a defense to prosecution."

We note that minor technical changes not relevant to this appeal were made to § 21a-278 (b) by No. 07-217, § 97, of the 2007 Public Acts. For purposes of convenience, references herein are to the current revision of the statute.

cers were in an unmarked patrol car, operated by Rivera. At approximately 5:15 p.m., the officers observed a Chevrolet Impala turn right from Ferry Street onto Grand Street without signaling. The officers followed the Impala around the block, during which time they also observed that the defendant, who was operating the car, was not wearing a seat belt. Pursuant to police department policy, the officers called dispatch to request a marked cruiser in order to effectuate a motor vehicle violation stop.

Three marked patrol cars responded to the dispatch call,[3] and stopped the Impala at the corner of Ferry Street and Grand Street. The unmarked patrol car stopped approximately one half of a car length behind the Impala. While still in their unmarked patrol car, Rivera, Miller and Gargano observed the defendant make a movement toward his right side, which led them to believe that the defendant might be concealing a weapon.[4] The three officers then approached the Impala. As they were approaching, Miller observed the defendant close the center console in the front seat.

Rivera removed the defendant from the vehicle, hand-cuffed him, and frisked him for weapons. While frisking the defendant for weapons, Rivera discovered $1369 in cash and several cell phones[5] on his person. At the same

---

[3] The transcripts of the testimony by Miller and Rivera are not explicitly clear whether two or three marked police cars responded to the dispatch call.

[4] Rivera described the movement as follows: "It appeared that [the defendant] was reaching with his right hand and his right side, he was lifting up, lifting himself up." Miller testified that he saw the defendant "moving around."

[5] In his trial testimony, Officer Rivera responded affirmatively to a question by the state's attorney regarding whether cell phones are used as a tool in the drug trade. Detective Michael J. Wuchek of the New Haven police department testified that it was common for drug dealers to use multiple cell phones. In response to the state's question concerning "boost" or disposable cell phones, Wuchek further testified: "Those are prepaid phones. We find that a lot of dealers use boost phones for the simple fact that they can't be traced back to them. They buy a phone in whatever store . . . and you don't have to use your proper, your real name or your real address because

time, Miller and Gargano, as well as several officers from the other patrol cars, removed the two passengers from the vehicle, handcuffed them, and frisked them for weapons. Miller then returned to the car and observed some plastic protruding from the center console. He opened the console and removed plastic bags that he believed to contain crack cocaine. The officers also determined that the Impala was owned by a rental car company. Subsequent testing revealed that the bags discovered in the console contained approximately 21.5 grams[6] of freebase cocaine, commonly referred to as crack cocaine.

The record also reveals the following procedural history. The defendant was arrested and charged by substitute information with possession of narcotics with the intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b) and possession of narcotics within 1500 feet of a school in violation of General Statutes § 21a-279 (d).[7] The defendant then filed a

there is no billing . . . they buy boost cards which adds minutes to their phones . . . and then they don't have to have a bill sent to their house and they could just conduct their business that way."

[6] Although the testimony of the witnesses regarding the exact amount of the crack cocaine seized from the vehicle that the defendant was operating differed, it is uncontested that the amount was at least 21.5 grams.

[7] General Statutes § 21a-279 provides in relevant part: "(a) Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned. . . .

"(d) Any person who violates subsection (a), (b) or (c) of this section in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school and who is not enrolled as a student in such school or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive

motion to suppress all evidence seized during the search of the Impala. The defendant claimed that the search was illegal because: (1) the police stopped his vehicle without probable cause; (2) they searched the vehicle without a valid search warrant; (3) the seized evidence did not fall within any exception to the warrant requirement; and (4) the defendant did not provide police with consent to search the vehicle. Following a suppression hearing, the trial court, *Damiani, J.*, denied the motion to suppress on the grounds that the initial investigatory stop of the vehicle was valid and that the officers' observations of the defendant's furtive movement established probable cause to search the vehicle.

At trial, the state introduced the testimony of Detective Michael J. Wuchek of the New Haven police department. Wuchek testified regarding his significant experience working with the Statewide Narcotics Task Force and as a detective in the narcotics division of the New Haven police department. Specifically, Wuchek noted that it is common for drug dealers to have multiple cell phones, especially "boost" or disposable cell phones; see footnote 5 of this opinion; carry significant amounts of cash and drive rental cars. He also testified that it would be uncommon for a drug user not in the business of selling narcotics to possess twenty grams of crack cocaine and that such a quantity was usually indicative of narcotics trafficking.

to any term of imprisonment imposed for violation of subsection (a), (b) or (c) of this section. . . ."

Although the record does not indicate whether the defendant violated subsection (a), (b) or (c) of this section, we note that possession of crack cocaine is generally charged as a violation of § 21a-279 (a). See, e.g., *State* v. *Ray*, 290 Conn. 602, 605–606, 967 A.2d 148 (2009) (defendant who sold crack cocaine to undercover police officer charged with violating, inter alia, § 21a-279 [a]); *State* v. *Johnson*, 286 Conn. 427, 430, 432, 944 A.2d 297 (2008) (defendant in possession of crack cocaine charged with violating, inter alia, § 21a-279 [a]).

After the state had presented its case, the defendant moved for a judgment of acquittal as to both charges. The defendant first claimed that the state had failed to establish that he had either actual or constructive possession of the narcotics found in the console of the vehicle. The defendant also claimed that the state had failed to establish that he was not a student enrolled at the school for the purposes of the charge under § 21a-279 (d). The trial court, *Vitale, J.,* denied the motion as to the possession with intent to sell charge under § 21a-278 (b), but granted it as to the possession charge under § 21a-279 (d). At the close of trial, the defendant again moved for a judgment of acquittal on the charge under § 21a-278 (b), and the trial court again denied the motion. This appeal followed.

I

The defendant first claims that the seizure of the narcotics from the console of the Impala violated his rights under the fourth amendment to the United States constitution[8] as established in the United States Supreme Court's recent holding in *Arizona* v. *Gant,* supra, 556 U.S. 332. Specifically, the defendant claims that, because this case presents "precisely the same" facts as those in *Gant,* we must deem the seizure of the narcotics unconstitutional. The state counters that *Gant* does not control this case because the officers engaged in a protective search rather than a search incident to an arrest. Rather, the state contends that *Michigan* v. *Long,* supra, 463 U.S. 1032, which extended the rationale of *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), to automobile stops, survived *Gant* and is dispositive of the present case.

Despite the defendant's protestations, a fair reading of *Gant* indicates that it does not, in fact, apply to the

---

[8] The defendant makes no claims under the Connecticut constitution as part of this appeal, and accordingly, we limit our analysis to the federal constitution.

facts at issue in the present case. In *Gant*, the United States Supreme Court began by noting that "the basic rule that 'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the [f]ourth [a]mendment—subject only to a few specifically established and well-delineated exceptions.' *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) . . . . Among the exceptions to the warrant requirement is a search incident to lawful arrest. See *Weeks* v. *United States*, 232 U.S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652 (1914). The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona* v. *Gant*, supra, 556 U.S. 338. The court clarified that the search incident to arrest exception, as set forth previously in *New York* v. *Belton*, 453 U.S. 454, 457–58, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), "does not authorize a [protective] vehicle search incident to a recent occupant's arrest after the arrestee has been secured *and cannot access the interior of the vehicle.*"[9] (Emphasis added.) *Arizona* v. *Gant*, supra, 335. Although the defendant claims that he was arrested for the motor vehicle offense, the record clearly reflects that he was not arrested until after the narcotics were discovered.[10]

---

[9] Although it is not relevant in the present case, which deals solely with a protective search for weapons incident to a lawful arrest, we note that the court also reaffirmed the principle that, under federal law, "circumstances unique to the vehicle context [continue to] justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." (Internal quotation marks omitted.) *Arizona* v. *Gant*, supra, 556 U.S. 343; see also *State* v. *Boyd*, 295 Conn. 707, 733 and n.16, 992 A.2d 1071 (2010).

[10] For the first time at oral argument before this court, the defendant argued that he was subjected to a custodial arrest under *United States* v. *Mendenhall*, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). "We decline to consider this contention because [i]t is well settled that claims on appeal must be adequately briefed . . . and cannot be raised for the first time at oral argument before the reviewing court. *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006)." (Internal quotation marks omitted.)

Accordingly, the defendant's reliance on *Gant* for his assertion that the seizure of the narcotics was unconstitutional is misplaced.

What *is* instructive about *Gant*, however, is the Supreme Court's cautionary statement that it did not intend to disturb its precedents controlling other exceptions to the warrant requirement. Id., 346–47. As the court noted: "Other established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand. For instance, *Michigan* v. *Long*, [supra, 463 U.S. 1032], permits an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.' " *Arizona* v. *Gant*, supra, 556 U.S. 346–47. Accordingly, as the state contends, it is clear that *Long* survived *Gant* and continues to control warrantless protective searches of vehicles.

Because the rubric of *Long* is well established, we need only highlight the fact that protective searches under that case may be valid even when a detained suspect is already handcuffed. "Federal courts have . . . recognized that suspects in handcuffs can remain a danger to the police, particularly when weapons are present. . . . As a result, [they have] held that the danger justified a pat-down to secure the officer's safety. . . . *United States* v. *Wallen*, 388 F.3d 161, 166 (5th Cir. 2004), cert. denied, 544 U.S. 967, 125 S. Ct. 1747, 161 L. Ed. 2d 613 (2005). [T]he fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer[s]. In [*Michi-*

*Kramer* v. *Petisi*, 285 Conn. 674, 686, 940 A.2d 800 (2008); see also *State* v. *DeFusco*, 224 Conn. 627, 635, 620 A.2d 746 (1993) (declining to address issue that was neither briefed by parties nor raised in trial court).

gan v. *Long,* supra, 463 U.S. 1051–52], the [United States Supreme] Court identified a purpose of protective searches to be the concern that if the suspect is not placed under arrest, he will be permitted to . . . [go free], and he will then have access to any weapons . . . . *United States* v. *Wallen,* supra, 166." (Internal quotation marks omitted.) *State* v. *Nash,* 278 Conn. 620, 646–47, 899 A.2d 1 (2006); see also *Arizona* v. *Gant,* supra, 556 U.S. 352 (Scalia, J., concurring) ("[i]n [a] no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed").

In analyzing the search in the present case under the *Long* protective search framework to determine whether the search was proper, our focus is on whether the officers had a reasonable and articulable suspicion to believe that the defendant posed a danger and might access the vehicle to gain control of a weapon. *Michigan* v. *Long,* supra, 463 U.S. 1049–50; see also *State* v. *Mann,* 271 Conn. 300, 312, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). The existence of reasonable and articulable suspicion is a question of law, which we review de novo. *State* v. *Mann,* supra, 322–23.

In conducting this analysis, we are cognizant of "the well settled principle that, in testing the amount of evidence that supports probable cause, it is not the personal knowledge of the arresting officer, but the collective knowledge of the law enforcement organization at the time of the arrest that must be considered. See *Poulos* v. *Pfizer, Inc.,* 244 Conn. 598, 619, 711 A.2d 688 (1998) (*McDonald, J.,* concurring) (Fourth amendment law recognizes that the collective knowledge of the police determines probable cause. See *Whiteley* v. *Warden,* 401 U.S. 560, 568, 91 S. Ct. 1031, 28 L. Ed. 2d 306 [1971]; see 2 W. LaFave, Search and Seizure [3d

Ed. 1996] § 3.5 [b], p. 259 n.46.); *State* v. *Acquin*, 187 Conn. 647, 657, 448 A.2d 163 (1982) (when we test the quantum of [evidence supporting] probable cause, it is not the personal knowledge of the arresting officer but the collective knowledge of the law enforcement organization at the time of the arrest which must be considered), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983), overruled in part on other grounds by *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)." (Internal quotation marks omitted.) *State* v. *Batts*, 281 Conn. 682, 698, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007); see also *United States* v. *Garcia*, 413 F.3d 201, 213 (2d Cir. 2005) ("[i]t is entirely reasonable and responsible for law enforcement officers, in performing their day-to-day duties, to rely on the collective knowledge of their colleagues"). Although this court typically has applied the collective knowledge doctrine to determinations of probable cause, we conclude that it is equally applicable to the reasonable suspicion determination. See, e.g., *United States* v. *Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers"); *United States* v. *Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) ("[w]e have recognized that reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle"); *United States* v. *Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) ("[t]he officers were allowed to stop [the defendant] if, under the totality of the circumstances . . . from the collective knowledge of the officers involved in the stop . . . they had an objectively reasonable suspicion that [the defendant] had engaged, or

was about to engage, in a crime" [citations omitted; internal quotation marks omitted]); see also *Poulos* v. *Pfizer, Inc.*, supra, 619 (*McDonald, J.*, concurring) (Justice McDonald argued for the application of the collective knowledge doctrine to the reasonable suspicion standard because "[f]ourth amendment law recognizes that the collective knowledge of the police determines probable cause . . . . Reasonable suspicion is a lesser standard [for belief] than probable cause." [Citations omitted; internal quotation marks omitted.]).

"We have often stated . . . that it is reasonable for police officers to suspect guns to be associated with illegal drug selling operations. *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001) (Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms . . .); see also *United States* v. *Wilson*, 306 F.3d 231, 238 (5th Cir. 2002) (dealing in narcotics sufficient for reasonable belief in potential for violence and presence of weapon)." (Internal quotation marks omitted.) *State* v. *Spencer*, 268 Conn. 575, 606, 848 A.2d 1183 (*Borden, J.*, dissenting), cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004). Accordingly, evidence of drug dealing may support an officer's determination of reasonable suspicion of dangerousness. See *State* v. *Nash*, supra, 278 Conn. 630 (behavior consistent with narcotics dealing relevant factor in analysis of reasonable suspicion); *State* v. *Mann*, supra, 271 Conn. 325 (correlation between trafficking of crack cocaine and weapons one of factors considered in analyzing warrantless search of suspected drug dealer); *State* v. *Clark*, supra, 284 (same). Similarly, a suspect's presence in an area known for drug trafficking or other crime may also support a determination of reasonable suspicion of dangerousness. *State* v. *Nash*, supra, 634.

Under the collective knowledge doctrine, we may consider the knowledge of both Officers Miller and

Rivera in determining whether Miller had reasonable suspicion sufficient to justify the protective search.[11] Miller and Rivera both witnessed the defendant make a furtive movement toward the console, and Miller also saw the defendant close the console as the officers approached the vehicle. While Miller removed and frisked one of the passengers, Rivera removed the defendant from the car and frisked him. In that process, he discovered three cell phones and $1369 in cash, which, as the state established at trial, are often associated with narcotics dealing. Miller also testified that he had been aware that there was frequent narcotics trafficking in the neighborhood where the stop occurred. The collective knowledge of the officers amply supported an inference that the defendant was involved in narcotics trafficking, and, accordingly, that he was potentially armed and dangerous.[12] Combined with the observation of the defendant's movements toward the console, the officers reasonably suspected that the defendant presented a danger to them that needed to be investigated before they safely could allow the defendant and his companions to reenter the vehicle. Accordingly, Miller had a proper basis for effectuating the protective search of the console.

---

[11] We therefore need not decide whether Miller's observation of a furtive movement, alone, is sufficient to establish reasonable and articulable suspicion of dangerousness, a question that remains open. Compare *United States* v. *Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (noting that informant's tip and furtive movement sufficient to establish reasonable suspicion, but suggesting that furtive movement alone would not be sufficient) with *United States* v. *Paulino*, 850 F.2d 93, 94 (2d Cir. 1988) (movement of backseat passenger "as if placing an object on the floor" established reasonable cause to lift floor mat as part of protective search), cert. denied, 490 U.S. 1052, 109 S. Ct. 1967, 104 L. Ed. 2d 435 (1989).

[12] The testimony of the police officers did not conclusively establish the sequence of the patdown searches and console search. Nonetheless, because "the events were substantially contemporaneous and integral parts of the same incident"; *State* v. *Arline*, 74 Conn. App. 693, 703, 813 A.2d 153, cert. denied, 263 Conn. 907, 819 A.2d 841 (2003); we consider the observations of each of the officers in determining that there was a reasonable suspicion of dangerousness.

## II

The defendant next claims that the state failed to prove beyond a reasonable doubt that he was in possession of the seized contraband, and, therefore, there was insufficient evidence to convict him under § 21a-278 (b). He claims that the only evidence linking him to the narcotics was his operation of and presence in the vehicle where the drugs were found, as well as the officers' observation of him moving toward and closing the console, and that this evidence established neither actual nor constructive possession. We disagree.

"As a preliminary matter, we set forth the applicable standard of review. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by

the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . *State* v. *Farnum,* 275 Conn. 26, 32–33, 878 A.2d 1095 (2005); see also *State* v. *Perkins,* 271 Conn. 218, 246–48, 856 A.2d 917 (2004) (using sufficiency standards to determine intoxication in manslaughter case).

"[An] appellate court's first task, in responding to a claim of evidentiary insufficiency, is to apply the traditional scope of review to the evidence. That requires that . . . we view all of the evidence, and the reasonable inferences drawable therefrom, in favor of the [trier's] verdict. *State* v. *Sivri,* 231 Conn. 115, 135, 646 A.2d 169 (1994); see also *State* v. *Morgan,* 274 Conn. 790, 801, 877 A.2d 739 (2005) ([o]ur review is a fact based inquiry limited to determining whether the inferences drawn by the [trier of fact] are so unreasonable as to be unjustifiable . . .). We note that a claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Morelli,* 293 Conn. 147, 151–53, 976 A.2d 678 (2009).

In order to establish that a defendant is guilty of possession with intent to sell under § 21a-278 (b), the state must prove beyond a reasonable doubt that the defendant had either actual or constructive possession of the narcotics. *State* v. *Hernandez,* 254 Conn. 659,

669, 759 A.2d 79 (2000). "To prove either actual or constructive possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it." (Internal quotation marks omitted.) Id. Under the doctrine of nonexclusive possession, "[w]here the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . [Although] mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Bruno*, 293 Conn. 127, 136–37, 975 A.2d 1253 (2009).

It is undisputed that the defendant was not in exclusive possession of the vehicle. Accordingly, without additional incriminating circumstances, the mere fact that the defendant was present in the vehicle and could have exercised control over the narcotics was insufficient to establish possession. The state therefore bore the burden of establishing incriminating circumstances or statements buttressing the inference that the defendant knew about, and had control over, the narcotics in the console. See *State* v. *Williams*, 258 Conn. 1, 7, 778 A.2d 186 (2001). The state claims that it met that burden because the evidence that the defendant moved toward and then closed the console, coupled with evidence from which the jury reasonably could have inferred that the defendant was a narcotics trafficker,

sufficiently established that the defendant exercised control and dominion over the narcotics. We agree.

As we previously have noted herein, the police officers observed the defendant make a movement toward the console after the Impala was stopped, and then Officer Miller observed the defendant close the console as they approached the vehicle. When Miller returned to the vehicle, he saw the plastic bag, which later was determined to contain cocaine, protruding from a corner of the console. This manipulation of the console within which the narcotics were discovered, presumably to conceal that contraband, buttressed the jury's inference that the defendant knew about the narcotics and had control over them. See *State* v. *Bowens*, 118 Conn. App. 112, 129, 982 A.2d 1089 (2009) (evasive action "manifested an intent to exercise dominion and control over the contraband"), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010); *State* v. *Smith*, 94 Conn. App. 188, 194, 891 A.2d 974 (observation of defendant reaching toward floor of vehicle where police later found bags of crack cocaine relevant to establishing possession), cert. denied, 278 Conn. 906, 897 A.2d 100 (2006). Moreover, as noted previously, there was significant evidence from which it was reasonable for the jury to infer that the defendant was a narcotics dealer. Such an inference would also help support the further inference that the defendant had possessed the narcotics. See *State* v. *Marshall*, 114 Conn. App. 178, 188, 969 A.2d 202 (evidence that defendant had sold narcotics from same vehicle to undercover agent relevant to dispel doubts about possession), cert. denied, 292 Conn. 911, 973 A.2d 661 (2009); *State* v. *Diaz*, 109 Conn. App. 519, 527, 952 A.2d 124 (claim of insufficient evidence to support possession of narcotics unavailing when "[t]he jury had before it ample evidence from which it could infer that the defendant was a drug seller and that his apartment was integral to that criminal enterprise"),

cert. denied, 289 Conn. 930, 958 A.2d 161 (2008); *State v. Riser*, 70 Conn. App. 543, 553–54, 800 A.2d 564 (2002) (discovery of $1532 and other evidence demonstrating that defendant was trafficking crack cocaine supported inference of possession of contraband). Accordingly, we conclude that the jury reasonably could have concluded that the defendant in the present case had possession of the narcotics sufficient to support the guilty verdict.

The judgment is affirmed.

In this opinion the other justices concurred.