STATE OF CONNECTICUT *v.* CHARLES AROKIUM
(AC 33437)

Beach, Sheldon and Flynn, Js.

Argued November 26, 2012—officially released June 18, 2013

*Elizabeth M. Inkster*, assigned counsel, with whom was *Jennifer B. Smith*, assigned counsel, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *David R. Applegate*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Charles Arokium, appeals from the judgment of conviction rendered against him following a jury trial on charges of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a) and possession of narcotics in violation of General Statutes § 21a-279 (a). On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress, which challenged the legality, under the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the constitution of Connecticut, of the stop of his person and a motor vehicle, which led to the seizure of narcotics upon which his conviction was based, and (2) convicted him of both a greater offense and a lesser included offense on the basis of the same underlying conduct, in violation of his fifth and fourteenth amendment right against double jeopardy. We affirm in part and reverse in part the judgment of the trial court.

The following facts are relevant to our resolution of the defendant's appeal. During January, 2009, Officer Christopher Broems of the Stamford police department conducted an investigation into suspected narcotics

related activity at the Stamford Motor Lodge located at 1209 East Main Street in Stamford (hotel).[1] In the course of that investigation, the Stamford police department received a tip from a confidential informant[2] that the occupant of room 273 was selling cocaine in that location. The confidential informant described the seller, whom he claimed to know only as Charlie, "as a dark skinned, black male, with a shaved head in his mid-thirties, approximately [six feet, two inches] tall and [a] chubby build." On January 4, 2009, the confidential informant told Sergeant Christopher Baker of the Stamford police department that the informant had previously observed at least fifty grams of powder cocaine and a substantial amount of money in room 273. On January 5, 2009, Broems was informed by the front desk clerk of the hotel that Charles Arokium had been renting room 273 for the past fifteen weeks.

Thereafter, on January 6, 2009, the confidential informant, in cooperation with the Stamford police, successfully made a controlled purchase of suspected narcotics from the seller known as Charlie in room 273. On that date, Broems observed the informant enter room 273, where the informant remained for a short period of time before exiting and walking directly to a prearranged rendezvous location, where the informant gave Broems two clear plastic bags containing suspected cocaine. After the police confirmed that the substance in the bags tested positive for cocaine, Broems, in plainclothes, set up a surveillance of room 273 from an unmarked police vehicle in the parking lot of the hotel. Broems subsequently observed a dark colored Dodge Magnum pull into the hotel parking lot and park in the vicinity of room 273. Broems then saw a large, light skinned black

---

[1] The hotel is now named America's Best Value Inn.

[2] The state presented testimony that the confidential informant had provided reliable information to the Stamford police in the past resulting in two arrests and the recovery of narcotics.

male, approximately six feet, two inches tall, exit the vehicle and approach room 273, empty-handed. Broems saw this man, later identified as Ricky Samas, knock on the door of room 273, then enter the room when the door was answered, where he stayed for five minutes before exiting, carrying a plastic bag. Samas then entered the Dodge and sped away onto Interstate 95 northbound. Although other Stamford police officers, alerted to Samas' departure by Broems, gave chase, they were unable to find, or thus to stop, Samas' vehicle.

Shortly thereafter, Broems observed a silver Nissan Maxima parked in the hotel parking lot in the vicinity of room 273. He then saw a thin black male, approximately five feet, seven inches tall, exit the vehicle and approach room 273 with what appeared to be an empty bag folded underneath his arm. This man, later identified as Darnell Barber, knocked on the door of room 273 and was admitted by someone within. Barber remained in the room for approximately fifteen minutes before exiting, carrying the previously folded bag, which then appeared to contain a package. Barber promptly got back into the Nissan and departed with the female driver, who was later identified as Tanya Bruce, onto Interstate 95 southbound. Believing that a drug transaction had just occurred, Broems directed Officer Richard Byxbee of the Stamford police department to stop the Nissan. When Byxbee, a uniformed officer in a marked police cruiser, stopped the Nissan on Interstate 95, Broems drove his unmarked vehicle to the location of the stop in order to investigate Barber and Bruce. While performing a check of the occupants' licenses and the Nissan's registration, Broems and Byxbee observed a shoe box containing two bundles of money in plain view in the backseat of the Nissan.[3] Thereafter, Broems and Byxbee turned Barber, Bruce and the Nissan over to three other Stamford police

---

[3] The police later determined that the shoe box contained $29,000 in cash.

officers, who had joined them at the location of the stop, for further investigation, including a search of the Nissan by a state police canine. Broems and Byxbee returned[4] to the hotel to resume surveillance of room 273. In the meantime, the Stamford police began the process of applying for a warrant to search that room.

While waiting for the issuance of a search warrant, Broems observed another black male exit room 273 whom he had not seen enter. This man, later identified as the defendant, was carrying a plastic shopping bag. Broems exited his vehicle and followed the defendant on foot to determine whether he matched the confidential informant's description of Charlie. At that moment, Broems notified Byxbee, who had parked his police cruiser on a nearby side street, that he was pursuing a suspect near the front of the hotel. Standing about two feet from the defendant, Broems determined that he matched the informant's description of Charlie.[5] Broems then told Byxbee: "[T]his is Charlie. This is the person we [are] looking for." Shortly thereafter, the defendant entered a taxicab (cab). As the cabdriver was beginning to drive away, Broems quickly alerted Byxbee and requested that he enter the hotel parking lot and cut off the cab to prevent the defendant from leaving. Attempting to stall the defendant's departure, Broems approached the cabdriver and stated that he was in need of a cab. Moments later, Byxbee entered the parking lot and parked his cruiser directly in front of the cab. Broems then pulled out and displayed his badge and ordered the defendant to get out of the cab. Five to thirty seconds then passed, during which the defendant neither moved nor spoke. Believing that the defendant might have been armed, Broems opened the rear passenger door of the cab and "ripped [the defendant] out

---

[4] Broems had left room 273 unattended for approximately twelve minutes in order to investigate Barber and Bruce.

[5] Broems testified that the defendant was a bald, dark skinned black male, approximately six feet tall, who had a medium to stocky build.

of the car, and threw him on the ground, and handcuffed him . . . ."[6] While securing the defendant, Broems saw that the bag that the defendant had been holding had fallen to the ground, partially exposing some of its contents to view. He noted, in particular, that several manila envelopes had spilled out of the defendant's bag, and that a clear plastic bag containing a white powder substance he suspected of being powder cocaine had fallen out of one of the Manila envelopes. Also lying on the ground in plain view, Broems saw several small ziplock bags imprinted with apples, which he believed to be drug packaging material.[7]

The defendant was charged in connection with the previously described seizures with one count each of possession of narcotics with intent to sell in violation of § 21a-277 (a) and possession of narcotics in violation of § 21a-279 (a). The defendant filed a motion to suppress all physical evidence obtained by the police when they seized him from the cab, claiming that the police had neither a reasonable and articulable suspicion to stop him nor probable cause to arrest him. After a suppression hearing conducted midtrial, the trial court denied the defendant's motion. In its oral ruling denying the defendant's motion, the trial court concluded as follows: "[T]he police, in general, and Officer Broems, in particular, had probable cause to arrest the defendant. And even if [Broems] didn't have probable cause,

[6] Specifically, Broems testified: "With narcotics, I didn't know who the suspect was. I didn't know too much about him, except his name was Charlie. In my experience over eight years, narcotics and weapons are hand in hand. I didn't know if he was armed. I wasn't going to give him a chance to come up with a plan of anything. I had no idea who this man was; what he's about.

"So, my job is to just get him out of the car; handcuff him as immediately as possible, for officers' safety, and the safety of the public."

[7] The state presented the following testimony: "In the aspect of cocaine, some people will put their own stamp [or symbols on drug packaging]. They will buy a . . . specific kind because they want people to know that's their product."

at a minimum, he had reasonable suspicion to believe that criminal conduct was going on, and he had a right to maintain the status quo."

The defendant was tried by a jury and found guilty of possession of narcotics with intent to sell and possession of narcotics. Thereafter, the trial court merged the defendant's conviction of possession of narcotics, on count two, with his conviction of possession of narcotics with intent to sell, on count one, and sentenced the defendant on the first count to a total effective sentence of ten years imprisonment with five years of special parole.[8] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress evidence obtained from the police stop of the cab, arguing that the officers conducting the stop lacked sufficient information to establish a reasonable and articulable suspicion of criminal activity and that probable cause to arrest him did not arise during the course of the stop.[9] Specifically, the defendant contends that "[t]he stop of the defendant was based on nothing more than a police officer's suspicions" because, at the time of the stop, the description provided by the confidential informant was too vague, there was no corroboration of the information provided by the confidential informant and the police did not

---

[8] At the sentencing hearing, held on November 16, 2010, the trial court explained: "[O]n the charge of simple possession of narcotics, I am not going to impose a sentence because that's a lesser included [offense]. I am going to . . . merge that offense with the other offense."

[9] The defendant also claims that the trial court erred in denying his motion to suppress because the police lacked probable cause to arrest him at the time of the stop. Because we conclude that the arresting officers possessed a reasonable and articulable suspicion of criminal activity, which is sufficient to perform an investigatory stop; See *State* v. *Freeman*, 132 Conn. App. 438, 448, 33 A.3d 256 (2011), cert. granted on other grounds, 303 Conn. 922, 34 A.3d 395 (2012); we need not address the merits of this claim.

see the defendant engage in any criminal activity or furtive behavior. We disagree.

In denying the defendant's motion to suppress, the trial court found the following relevant facts. On January 6, 2009, the confidential informant, in cooperation with the Stamford police department, obtained cocaine during the course of a controlled purchase in room 273 of the hotel from a man named Charlie. The informant previously had provided a physical description to the Stamford police and explained that Charlie had been living in the room for an extended period of time. That same day, Broems had observed two men visit the room for short periods of time and depart carrying bags. One of those men was found to be in possession of $29,000 in cash after leaving room 273. While waiting for other Stamford police officers to procure the issuance of a search warrant for the room, Broems observed a man, later identified as the defendant, leave room 273 carrying a bag and enter a cab. Broems had not seen the defendant enter the room. After determining that the defendant matched the description of Charlie, Broems believed that the defendant was the person who had been selling cocaine out of room 273. Accordingly, Broems and Byxbee stopped the cab in which the defendant was traveling and asked him to exit. When the defendant did not comply at once, Broems, believing that the defendant might have been armed, pulled him out of the backseat of the cab and threw him to the ground. During that encounter, some of the contents of the defendant's bag spilled to the ground, allowing the officers to observe, in plain view, what appeared, on the basis of their training and experience, to be cocaine.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . .

[When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . .

"On appeal, [t]he determination of whether reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct. . . .

"An investigating officer may briefly stop a motorist if the officer has a reasonable and articulable suspicion that criminal activity may be afoot." (Citations omitted; internal quotation marks omitted.) *State* v. *Burns*, 140 Conn. App. 347, 354–55, 59 A.3d 819, cert. denied, 308 Conn. 918, 62 A.3d 1132 (2013). Similarly, "[u]nder the fourth amendment to the United States constitution . . . a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. . . . [I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . Because a reasonable and articulable suspicion is an objective standard, we focus not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, 137 Conn. App. 520, 538, 48 A.3d 748, cert. denied, 307 Conn. 914, 54 A.3d 179 (2012). "A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime."

(Internal quotation marks omitted.) *State* v. *Doyle*, 139 Conn. App. 367, 383, 55 A.3d 805 (2012), cert. denied, 307 Conn. 952, 58 A.3d 976 (2013).

"In cases in which a police stop is based on an informant's tip, corroboration and reliability are important factors in the totality of the circumstances analysis." (Internal quotation marks omitted.) *State* v. *Burns*, supra, 140 Conn. App. 355. Our Supreme Court has "consistently held that an informant's record of providing information that led to arrests and seizures of contraband is sufficient to establish the reliability of the informant." (Internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 11, 997 A.2d 461 (2010).

As to the trial court's findings of fact, the defendant argues that "the court made clear error in its factual findings that the defendant matched the description of 'Charlie' " because it was too vague. We disagree. Broems testified that a known confidential informant provided a description to the Stamford police. This informant had provided reliable information to the officers in the past, resulting in two arrests and the recovery of narcotics. The informant explained that a man named Charlie was selling cocaine from room 273 at the hotel. The informant stated that Charlie was "a dark skinned, black male, with a shaved head in his mid-thirties, approximately [six feet, two inches] tall and [a] chubby build." At the suppression hearing, Broems testified that he spotted the defendant leaving room 273 and that he matched the informant's description of the man living inside that room who had been dealing in narcotics. The trial court, therefore, had ample evidence from which it reasonably could have concluded that the defendant matched the description of Charlie.

As to the court's determination that a reasonable and articulable suspicion existed that the defendant was then engaged in criminal activity, the defendant claims

that "the objective facts known to Officer Broems at the moment of the stop were insufficient to establish reasonable and articulable suspicion" in the absence of proper corroboration. We disagree. The court based its finding of a reasonable and articulable suspicion on the reliability of the confidential informant and the observations of the police officers. The informant notified the police that a man was selling cocaine from room 273 at the hotel. The informant was known by the police and had provided reliable information in the past regarding criminal activity. See *State* v. *Clark*, supra, 297 Conn. 14–15 (where informant is known from past practice to be reliable, no corroboration will be *required* to support reasonable suspicion). The officers conducted a controlled purchase in which the informant obtained cocaine from someone in room 273. The police officers confirmed that a man named Charles had been renting that room for an extended period of time. Armed with this information, Broems observed two people visit room 273, whose behavior reasonably suggested that they were engaging in drug trafficking activity. Both men were admitted into the room by someone else inside and departed shortly thereafter, carrying plastic bags. One such person was found in possession of $29,000 in cash in a shoe box shortly after leaving the room. The defendant, who matched the informant's description of Charlie, was subsequently seen leaving that very room with a plastic bag. On the basis of the officers' observations and their prior relationship with the informant, we conclude that it was reasonable for the officers to infer that the informant's tip was reliable and that such tip provided them with a reasonable and articulable suspicion to believe that the defendant was then engaging in criminal activity. The trial court's legal conclusion that such a reasonable and articulable suspicion existed at the time of the stop is legally and logically correct and supported by the facts.

The defendant further argues that probable cause did not arise during the course of the *Terry*[10] stop. Specifically, he claims that "the defendant did not make furtive or erratic movements [and] [n]othing about the defendant's behavior at the time he was pulled from the cab served to validate a finding that criminal activity had occurred." We are not persuaded.

"Under *Terry* [v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." (Internal quotation marks omitted.) *State* v. *Sward*, 124 Conn. App. 546, 552–53, 5 A.3d 965 (2010). "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." (Internal quotation marks omitted.) *State* v. *DelValle*, 109 Conn. App. 143, 155, 950 A.2d 603, cert. denied, 289 Conn. 928, 958 A.2d 160 (2008).

Our Supreme Court has "often stated . . . that it is reasonable for police officers to suspect guns to be associated with illegal drug selling operations. . . . Accordingly, evidence of drug dealing may support an officer's determination of reasonable suspicion of dangerousness." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 74, 993 A.2d 970 (2010). "[T]he law recognizes the important need to allow authorities to graduate their responses

---

[10] *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

to the demands of any particular situation." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 642, 899 A.2d 1 (2006). "[W]e do not require police officers who are properly attempting to neutralize the threat of physical harm to do so at increased peril." (Internal quotation marks omitted.) Id., 644. "[W]hile we respect the constitutional rights against unreasonable search and seizure of the citizenry . . . it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." (Internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 298, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006).

Here, the facts of the present case, as found by the trial court, lead to the conclusion that Broems was faced with a situation that he reasonably feared might pose imminent danger to himself and others. When he approached the defendant, Broems possessed sufficient information to give rise to a particularized and objective basis for suspecting that the defendant was engaged in criminal activity. Broems ordered the defendant out of the cab. See *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1988) (state constitution permits police to require occupants to exit lawfully stopped motor vehicle). His suspicions were further aroused when the defendant failed to comply immediately with that request. With reasonable suspicion that the defendant, who was suspected of dealing in narcotics, might have been armed, Broems properly removed the defendant from the cab when he did not comply with Broems' orders.

"The warrantless seizure of contraband that is in plain view is reasonable under the fourth amendment if two requirements are met: (1) the initial intrusion that enabled the police to view the items seized must have been lawful; and (2) the police must have had probable cause to believe that these items were contraband or stolen goods." (Internal quotation marks omitted.) *State*

v. *Brodia*, 129 Conn. App. 391, 397, 20 A.3d 726, cert. denied, 302 Conn. 913, 27 A.3d 373 (2011). "The plain view doctrine is based upon the premise that the police need not ignore incriminating evidence in plain view while they are operating within the parameters of a valid search warrant or are otherwise entitled to be in a position to view the items seized. . . . [I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the [f]ourth [a]mendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. . . .

"Under the plain view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. . . . The police meet the immediately apparent requirement if, [up]on discovery, they have probable cause to associate the property in plain view with criminal activity without further investigation." (Citations omitted; internal quotation marks omitted.) Id., 397–98.

As previously set forth, Broems specifically testified at the hearing on the defendant's motion to suppress that he stopped the defendant and ordered him out of the cab under reasonable suspicion of selling cocaine. After securing the defendant, whom he reasonably suspected of being armed, Broems observed a clear plastic bag containing suspected cocaine and other materials for packaging narcotics. The underlying facts, therefore, "were sufficient to establish probable cause to associate the property in plain view with criminal activity without further investigation." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 522, 903 A.2d 169 (2006). Because the officers lawfully

stopped the defendant and did not exceed the permissible scope of a *Terry* stop, the subsequent plain view seizure of the contraband that spilled from the defendant's bag was proper and, accordingly, gave rise to probable cause to arrest the defendant. The trial court, therefore, properly denied the defendant's motion to suppress.

## II

The defendant next claims that the judgment imposed on him by the trial court violated the prohibition against double jeopardy.[11] Specifically, he claims that the trial court improperly merged his conviction of possession of narcotics in violation of § 21a-279 (a), the lesser included offense, into his conviction of possession of narcotics with intent to sell in violation of § 21a-277 (a), the greater offense. It is the defendant's position that when a defendant has been convicted of both a greater offense and a lesser included offense, in violation of the double jeopardy clause of the federal constitution, the appropriate remedy is to vacate the conviction for the lesser included offense. In light of our Supreme Court's recent holding in *State* v. *Polanco*, 308 Conn. 242, 248, 61 A.3d 1084 (2013), we agree.

"Our standard of review for analyzing constitutional claims such as double jeopardy violations prohibited by the fifth amendment to the United States constitution presents an issue of constitutional and statutory interpretation over which our review is plenary." *State* v. *Johnson*, 137 Conn. App. 733, 753, 49 A.3d 1046, cert. granted on other grounds, 307 Conn. 927, 55 A.3d 568 (2012), 308 Conn. 938, 66 A.3d 881 (2013). The fifth amendment's protection against double jeopardy has been incorporated into and made applicable to the

---

[11] The defendant raises this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which authorizes certain constitutional claims to be made for the first time on appeal. The state does not contest its reviewability.

states under the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

"The federal and state constitutions prohibit multiple punishments if: (1) the charges arise out of the same act or transaction; and (2) the charged crimes are the same offense. . . . [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Citation omitted; internal quotation marks omitted.) *State* v. *Polanco*, 126 Conn. App. 323, 337–38, 11 A.3d 188 (2011), rev'd in part on other grounds, 308 Conn. 242, 61 A.3d 1084 (2013). Therefore, a lesser included offense of a greater offense exists if a finding of guilt of the greater offense necessarily involves a finding of guilt of the lesser offense. Because one cannot commit the greater offense of possession of narcotics with intent to sell without first committing the lesser offense of possession of narcotics, the defendant's conviction of this latter offense is violative of double jeopardy principles, and, on appeal, both the state and defendant agree that the defendant properly could not be sentenced on both convictions.

The parties agree that the single issue raised by the defendant's second claim on appeal is whether the merger of convictions approach or the vacatur approach is the appropriate remedy to be employed when a defendant has been sentenced for both greater and lesser included offenses in violation of the right against double jeopardy. Under the merger of convictions approach, a trial court will merge the conviction for the lesser included offense into the conviction for the greater offense and vacate the sentence for the lesser included offense. See *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). Under

the vacatur approach, however, a trial court will vacate the conviction for the lesser included offense. *State* v. *Polanco*, supra, 308 Conn. 247. The parties further agree that the Supreme Court's decision in *Polanco* is controlling and dispositive of this issue.[12] Accordingly, a review of that decision is warranted.

After our Supreme Court's decision in *Chicano* and until its holding in *Polanco*, "when a defendant [was] convicted of a greater offense and a lesser included offense in violation of the double jeopardy clause of the federal constitution, the appropriate remedy [was] to merge the convictions and to vacate the sentence for the lesser offense." Id., 244. In *Polanco*, the defendant was convicted on the greater offense of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and the lesser included offense of possession of narcotics with intent to sell in violation of § 21a-277 (a). Id., 246. Rendering judgment, the trial court improperly merged the defendant's sentences on those counts, imposing concurrent sentences. Id.

On appeal to this court, the defendant claimed, inter alia, that "his sentence violated the federal constitutional prohibition against double jeopardy due to the trial court's merger of his sentences rather than his convictions." Id. This court concluded that because § 21a-277 (a) is a lesser included offense of § 21a-278 (b) and both charges arose from the same act or transaction, the defendant's convictions for those crimes violated the double jeopardy clause. *State* v. *Polanco*, supra, 126 Conn. App. 338. This court concluded that the appropriate remedy was to remand the case to the trial court with direction to merge the conviction for the lesser included offense with the conviction for the

[12] When we heard oral argument on this appeal on November 26, 2012, the Supreme Court had not yet issued its decision in *Polanco*.

greater offense and to vacate the sentence for the lesser included offense. Id., 338–39.[13]

On appeal to our Supreme Court, the defendant claimed that, "although the Appellate Court's judgment was proper under [*Chicano*] and its progeny, Connecticut's rubric for sentencing defendants convicted of greater and lesser included offenses fails to conform to the requirements of federal constitutional law in light of the United States Supreme Court's decision in *Rutledge* v. *United States*, 517 U.S. 292, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996)." *State* v. *Polanco*, supra, 308 Conn. 245. Without reaching the merits of the defendant's constitutional argument, the court, electing to exercise its inherent supervisory authority over the administration of justice, concluded "that the vacatur approach shall replace the use of the merger of convictions approach . . . ."[14] Id., 248. The court reasoned that, "first, the jurisprudential underpinnings to this court's approval of the merger approach have since been repudiated, and, second, the remedy in *Chicano* is now at odds with the remedy utilized almost uniformly within the Circuit Courts of Appeals." Id., 249.

Accordingly, we apply the vacatur approach to the facts of the present case. Because one cannot commit the greater offense of possession of narcotics with intent to sell without first committing the lesser included offense of possession of narcotics, the defendant's conviction on the lesser included offense must

[13] In *State* v. *Polanco*, supra, 126 Conn. App 339 n.8, noting that the remedy it provided to the defendant was based on controlling Supreme Court precedent; see *State* v. *Mullins*, 288 Conn. 345, 379, 952 A.2d 784 (2008), overruled by *State* v. *Polanco*, supra, 308 Conn. 248; this court determined that there was no need to discuss the defendant's alternative argument that his conviction on the lesser included offense should have been vacated.

[14] Our Supreme Court further held that a conviction for a lesser included offense, previously vacated as violative of the double jeopardy clause, may be reinstated if the defendant's conviction for the greater offense subsequently is reversed for reasons unrelated to the viability of the vacated conviction. *State* v. *Polanco*, supra, 308 Conn. 263.

be vacated in order to comport with the fifth and fourteenth amendment prohibition against double jeopardy as explained by our Supreme Court in *Polanco*. We therefore remand this case to the trial court and direct that court to vacate the defendant's conviction of possession of narcotics in violation of § 21a-279 (a).

The judgment is reversed in part and the case is remanded with direction to vacate the conviction of possession of narcotics. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.