******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SHAWN G.*
(AC 42617)

Bright, C. J., and Elgo and Moll, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of possession of narcotics with intent to sell by a person who is not drug-dependent, criminal possession of a revolver and risk of injury to a child, and, after a plea of guilty, of being a persistent serious felony offender, the defendant appealed to this court, claiming that the evidence was insufficient to sustain his conviction and that the trial court improperly declined to issue a capias he requested. The police had executed a search warrant on the defendant's apartment, where he lived with his wife and minor stepchildren. During their search of the apartment, the police found, inter alia, a loaded revolver and cash in a storage container, crack cocaine in a dresser drawer, used drug baggies that tested positive for cocaine residue and a digital scale. Two cell phones also were found during a search of the defendant's person. The defendant told the police that the revolver was his and that he had bought it to protect his family. *Held*:

1. The evidence was sufficient to support the defendant's conviction of the weapon and drug charges, but his conviction of risk of injury to a child could not stand:

   a. The evidence was sufficient to establish that the defendant had dominion and control over and constructively possessed the revolver, as his ownership of the revolver was the ultimate manifestation of dominion and control; the defendant's admission to the police that he purchased the revolver to protect his family supported the conclusion that he intended to exercise dominion and control over it by using it for that purpose, and, notwithstanding his contention that he was not in exclusive possession of the apartment and that the state never proved that he resided there at the time of the search, there was abundant evidence from which the jury could conclude that the defendant lived there, including the concession by his counsel that he spent time there with his wife and family, and, that the revolver was found in the bedroom he shared with his wife, reinforced the evidence of his ownership of and intention to maintain dominion and control over the revolver.

   b. The defendant's claim that the state failed to prove that he constructively possessed the narcotics found in his bedroom was unavailing, the confluence of incriminating statements and circumstances having supported the inference that he was in a position of control over the narcotics and, thus, constructively possessed them: the jury had evidence before it that guns frequently are used by drug dealers to protect themselves and their cash and narcotics, the presence of the loaded revolver in the bedroom was relevant in determining whether the defendant intended to exercise dominion and control over the narcotics, the cash found in the same storage container as the revolver was in denominations that were significant to the purchase of narcotics, and digital scales are commonly used to ensure that narcotics are accurately measured for packaging and distribution; moreover, as the bedroom is an intimate area of the home, the jury reasonably could have concluded that access to it would ordinarily be limited to the defendant and his wife, and the cumulative effect of the most incriminating statements and circumstances relating to the conduct of someone involved in the sale of narcotics implicated the defendant, rather than his wife.

   c. The mere presence of a firearm hidden in a storage container in the defendant's bedroom did not constitute a situation under the risk of injury statute (§ 53-21 (a) (1)) in which a child was likely to be injured, and the state conceded that it failed to present sufficient evidence with respect to that charge; accordingly the judgment was reversed with respect to that conviction.

2. The defendant failed to demonstrate that the trial court violated his sixth amendment right to compulsory process when it declined to issue a capias for a police officer who failed to appear at trial in response to a subpoena and denied the defendant's request for a continuance:

a. Although the trial court mistakenly believed it could not issue the capias in the absence of in-hand service of the subpoena on the officer, who was in Florida at the time of trial, it properly considered the interwoven nature of the defendant's requests for the capias and a continuance before it denied the request for a continuance, which the defendant did not challenge on appeal, as the court had before it uncontroverted evidence that the officer had been out of state at all relevant times and would remain so for another two weeks, the defendant already had been granted continuances to procure witnesses, his request was untimely, the length of the requested continuance was too long, the proffered testimony would be cumulative of evidence already before the jury, and the denial of the continuance would not impair his ability to defend himself.

b. Any violation of the defendant's sixth amendment right to compulsory process stemming from the trial court's refusal to issue a capias to procure the police officer's presence was harmless beyond a reasonable doubt, as defense counsel conceded that the officer's testimony might have been cumulative of evidence that was already before the jury, the impact of the testimony would have been inconsequential, as the defendant never proffered that it would undermine the evidence against him, and, given that the officer had discovered the narcotics in the bedroom and heard the defendant confess that the gun was his, the testimony likely would have been adverse to the defense, for which the defendant never articulated to the court a reason to believe otherwise.

Argued December 2, 2020—officially released October 5, 2021

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of possession of narcotics with intent to sell by a person who is not drug-dependent, criminal possession of a revolver and risk of injury to a child, and, in the second part, with being a persistent serious felony offender, brought to the Superior Court in the judicial district of Middlesex, where the first part of the information was tried to the jury before *Suarez, J.*; verdict of guilty; thereafter, the defendant was presented to the court on a plea of guilty to the second part of the information; judgment of guilty in accordance with the verdict and plea, from which the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Shawn G., appeals from the judgment of conviction, rendered after a jury trial, of one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes (Rev. to 2017) § 21a-278 (b),[1] one count of criminal possession of a revolver in violation of General Statutes § 53a-217c (a) (1), and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that (1) the evidence adduced at trial was insufficient to sustain his conviction of each of the three counts, and (2) the trial court violated his sixth amendment right to compulsory process by declining to issue a capias that he requested. We affirm in part and reverse in part the judgment of the trial court.

At trial, the jury was presented with evidence of the following facts. The defendant lived in the first floor apartment of a two-story, multifamily house at 215 Pearl Street in Middletown (apartment). He shared the apartment with his wife and his two stepchildren—a sixteen year old boy and a twelve year old girl. On May 31, 2017, officers from the Middletown Police Department executed a search warrant on the defendant's apartment. When they arrived at the apartment, they observed the defendant and another male standing in the street. The police then went to the apartment, where the defendant's wife answered the door. The defendant's stepchildren were in the apartment at that time. During the search of the apartment, the officers found, among other things, crack cocaine and a revolver.

The defendant subsequently was arrested and charged with the aforementioned offenses. A trial followed, at the conclusion of which the jury found the defendant guilty of all counts. The defendant thereafter pleaded guilty to being a persistent serious felony offender in violation of General Statutes § 53a-40 (c). On October 3, 2018, the court sentenced the defendant to a total effective term of twenty years of incarceration, execution suspended after twelve years, plus five years of probation.[2] This appeal followed.

I

The defendant claims that the evidence adduced at trial was insufficient to establish his guilt for each of the three offenses of which he was convicted. The state concedes that the evidence is insufficient to support his conviction of risk of injury to a child but contends that the evidence was sufficient to support his conviction of criminal possession of a revolver and possession of narcotics with intent to sell by a person who is not drug-dependent. We agree with the state.

As this court has observed, "[a] defendant who asserts an insufficiency of evidence claim bears an arduous burden." *State* v. *Hopkins*, 62 Conn. App. 665, 669–

70, 772 A.2d 657 (2001). "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Capasso*, 203 Conn. App. 333, 338–39, 248 A.3d 58, cert. denied, 336 Conn. 939, 249 A.3d 352 (2021).

A

The defendant first claims that there was insufficient evidence to convict him of criminal possession of a revolver in violation of § 53a-217c (a) (1). Although he concedes that he had knowledge of the revolver, the defendant argues that there was insufficient evidence to prove that he exercised dominion or control over it. The state counters that, because the defendant admitted that he owned the revolver and the evidence supported a finding that he lived at the apartment and shared the bedroom where the revolver was found, the jury reasonably could have concluded that the defendant had dominion and control over it. We agree with the state.

The following additional facts are relevant to this claim. While searching the bedroom of the apartment, Detective Daniel Schreiner found a loaded Taurus .38 special revolver and $2661 in cash inside a stackable drawer. The uniform arrest report, which the defendant signed while being processed, listed the apartment as his address. Subsequently, the police questioned the defendant at the Middletown police station. At that time, the defendant waived his *Miranda*[3] rights in writing. During questioning by detectives, the defendant stated that the revolver was his and that he had purchased it

for $800 because he needed it to protect his family.

Section 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."[4] General Statutes § 53a-3 (2) defines "possess" as "to have physical possession or otherwise to exercise dominion or control over tangible property . . . ." Because the gun was not found on the defendant's person, the state prosecuted the defendant under the theory of constructive possession.

As our Supreme Court recently explained, "there are two kinds of possession, actual and constructive. . . . [C]onstructive possession is possession without direct physical contact. . . . To establish constructive possession, the control must be exercised intentionally and with knowledge of the character of the controlled object. . . . Moreover, [when] the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . [A]lthough mere presence is not enough to support an inference of dominion or control, [when] there are other pieces of evidence tying the defendant to dominion [or] control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime. . . .

"[A] case for constructive possession of a firearm often is necessarily built on inferences, and a jury may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Although [p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis . . . it must suffice to produce in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . [I]f the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. . . . Therefore, [b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic . . . that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [A]lthough we do not sit as the seventh juror when we review the sufficiency of the evidence . . . we also must be faithful to the constitutional requirement that no person be convicted

unless the [g]overnment has proven guilt beyond a reasonable doubt [and] take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Dawson*,      Conn.    ,    ,     A.3d      (2021).

In support of his argument that the evidence was insufficient, the defendant argues that the evidence demonstrates only that he had knowledge of the revolver and, further, that the state never proved that he actually resided at the apartment at the time of the search. Relying on *State* v. *Gainey*, 116 Conn. App. 710, 977 A.2d 257 (2009), and *State* v. *Billie*, 123 Conn. App. 690, 2 A.3d 1034 (2010), the defendant contends that the evidence is insufficient to establish dominion and control over the revolver. We disagree.

In *Gainey*, police officers executed a search warrant on the defendant's residence, where they detained the defendant and a female individual inside. *State* v. *Gainey*, supra, 116 Conn. App. 712. While searching the apartment, the police found a set of keys and an eviction notice addressed to the defendant and Jane Doe in one of the bedrooms, as well as a scale. Id. Their search continued in the yard to a vehicle, which they unlocked with keys found in the bedroom. Id. Inside the vehicle was a cell phone instructional manual. Id. Officers then found fifteen bags of heroin hidden in the ashtray area of the vehicle's rear passenger compartment. Id., 712–13.

After the defendant was convicted of possession of narcotics on the theory that he constructively possessed the drugs, this court determined that the evidence was insufficient to establish constructive possession because there was "no more than a temporal and spatial nexus between the defendant and the contraband . . . ." Id., 722. As the court noted, "[t]he eviction notice, without more, was insufficient to show that the room in which it was found was the defendant's bedroom, and, further, it could not be used to show that the room was exclusively for the use of the defendant. Presumably, an eviction notice that was addressed to both the defendant and a Jane Doe would concern any inhabitant of the house. There was also testimony about a woman being inside the house when the warrant was served. The items found inside the vehicle do not buttress the inference of exclusive control, either. Again, paperwork regarding the house, even in the defendant's name, does not evince control, especially if the jury had to consider that the house was inhabited by at least two persons. Additionally, the testimony regarding the [cell phone] instruction book was that the defendant's name was decorated 'with hearts and designs' and does not overwhelm us that there is more than a temporal or spatial nexus between the defendant and the drugs that were found in the backseat ashtray." Id., 722–23.

As the court emphasized, "the search did not yield any insurance or registration cards, and the last registered owner of the vehicle was not the defendant." Id., 712. Because none of the evidence in the home was sufficient to demonstrate that the defendant owned the vehicle and, more specifically, connected him to the narcotics found therein, this court concluded that the state could not establish that the defendant exercised dominion and control over the narcotics. Id., 722–23.

In *Billie*, an informant told the police that he had witnessed a " 'black male' " place narcotics underneath the rear porch of a particular residence. *State* v. *Billie*, supra, 123 Conn. App. 692. In response, officers were dispatched to the residence, where they discovered a clear, plastic sandwich bag underneath the rear porch area containing twenty-two smaller, individually wrapped packages of crack cocaine. Id. The police then removed all but one of the smaller packages, replaced the sandwich bag in the hidden location, and set up surveillance of the property. Id. Several hours later, the police observed the defendant enter the driveway at the front of the property and walk to the location of the narcotics. Id., 693. After officers emerged and identified themselves, the defendant dropped the sandwich bag containing only the single package of crack cocaine along with another bag containing marijuana. Id. The defendant thereafter was convicted of possession of narcotics with intent to sell under General Statutes § 21a-277 (a). Id., 693–94.

On appeal, the defendant conceded that he had possession of the single package of cocaine recovered after his arrest but argued that the state failed to present sufficient evidence that he constructively possessed the remaining twenty-one packages. Id., 697–98. The state noted that the defendant "purposely entered the property, proceeded directly to the location of the narcotics and immediately removed the sandwich bag from the hidden location without having to look or feel around," and that the defendant was a prior resident at the location. Id., 699. On appeal, this court reversed the judgment of conviction, reasoning that "the state's argument conflates the two separate requirements of constructive possession: knowledge and dominion and control." Id. The court stated: "[W]e believe that this evidence is relevant to whether the defendant had knowledge of the narcotics but does not support a reasonable inference of dominion and control. As this court has recognized, contraband found in a public area could have been secreted there by virtually anyone." (Internal quotation marks omitted.) Id.

In the present case, the defendant argues that, like the defendant in *Gainey*, he was not in exclusive possession of the apartment and the firearm was not found on his person, and, as in *Billie*, his statements to the police indicate that, at most, he had knowledge of the

revolver. Therefore, he contends that the evidence was insufficient to prove that he exercised dominion or control over the revolver. The evidence, however, does not support his contention that he had only "mere knowledge" of the revolver, as the defendant admitted to the officers that he purchased the revolver for personal use. In the absence of evidence that the defendant was deprived of physical possession, his ownership of the revolver is the ultimate manifestation of dominion and control. See Black's Law Dictionary (6th Ed. 1990) p. 1106 (Ownership is defined as "[t]he complete dominion, title, or proprietary right in a thing or claim. . . . The right of one or more persons to possess and use a thing to the exclusion of others."). Furthermore, the defendant's statement that he purchased the revolver to protect his family supports the conclusion that he intended to exercise dominion and control over it by using it for that purpose.

Moreover, the argument that the state never proved that the defendant lived at the apartment in question is both unfounded and beside the point. First, there is abundant evidence from which the jury could have concluded that the defendant lived at the apartment where the revolver was found, and, indeed, counsel for the defendant conceded that the defendant spent time at the apartment with his wife and family. Second, unlike in *Gainey*, in which the contraband was found in the rear passenger compartment of a vehicle but the evidence was insufficient to connect it to the defendant, and unlike in *Billie*, in which the contraband was found outside of the defendant's residence in a space accessible to the public, the revolver here was found in the defendant's bedroom, an intimate and private area of his residence. See *State* v. *Rhodes*, 335 Conn. 226, 232, 249 A.3d 683 (2020) ("the record contains sufficient circumstantial evidence, beyond mere proximity, that the defendant knew the firearm was in the car, was in a position to control it, and intended to control it"). The fact that the defendant shared the bedroom with his wife does not preclude a finding of constructive possession. As we observed in *State* v. *Bowens*, 118 Conn. App. 112, 124–25 n.4, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010), in which the defendant did not own the vehicle in which the contraband was found, "[c]onstructive possession can be joint, does not require actual ownership of the firearm, and can be established through circumstantial evidence . . . ." (Internal quotation marks omitted.) Indeed, the fact that the revolver was found in the bedroom of the defendant's apartment merely reinforces the evidence of his ownership and intention to maintain dominion and control over it. Accordingly, we conclude that the evidence was sufficient to support a finding that the defendant constructively possessed the revolver found in the apartment.

B

The defendant next claims that the state presented insufficient evidence to support his conviction of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b). We disagree.

The following additional facts are relevant to the defendant's claim. When the police arrived at the apartment to execute their search warrant, the defendant's wife answered the door, joined by a large dog, a pit bull.[5] At the request of the police, the defendant's wife put the dog in a crate. While searching the apartment, Detective Jorge Yepes found 3.1 grams of crack cocaine inside the upper left drawer of a dresser in the bedroom.[6] The dresser also had both men's and women's clothes in it. In the pocket of one of the men's pants and on the bedroom floor, Yepes found two " 'used drug baggies,' " which later tested positive for cocaine residue. At trial, Sergeant Frederick Dirga testified that the pants appeared to be for a "heavyset, large male." At the time, the defendant was five feet, nine inches, in height and weighed 240 pounds. The police also found two Michael Kors watches in the bedroom on the top of the stackable storage containers. Baughnita Leary, the defendant's girlfriend, testified that the watches were gifts that she had given to the defendant. In the basement of the apartment, the police found a digital scale, typically used by drug dealers to measure cocaine for packaging for sale, inside a bag of men's clothing identified as belonging to the defendant. At the time of the search, the defendant was physically present in front of the apartment. When the police searched the defendant's person, they found two cell phones.[7]

In addition to the watches and revolver establishing the defendant's residence at the apartment bedroom, Dirga testified at trial that he had seen the defendant "come and go" to and from the apartment "too many times to count" during the period of February to May, 2017, and that the defendant lived on the first floor. Detective Nathan Peck, to whom the defendant admitted that he owned the revolver, testified that he also witnessed the defendant "come and go" to and from the residence on numerous occasions.

The state also presented evidence that the defendant had various expensive expenditures that were inconsistent with his reported employment and wage history. For example, the state presented the arrest report, which was filled out by the police during their questioning of the defendant, in which the defendant listed his current occupation as "unemployed."[8] The state also offered the testimony of Emilio Theodoratos, a wage employment agent from the Department of Labor. Theodoratos testified that he had reviewed the defendant's reported employment history. According to a Department of Labor automated benefits system report of the defendant's reported employment and wage history,

there was no record of any employment during the first six months of 2017 and no record of employment at all in 2016. However, while searching the glove compartment of the defendant's automobile, the police located a bill of sale for a 2017 Victory motorcycle. That bill of sale indicated that the defendant paid for a $21,516.87 Victory Magnum motorcycle in full and in cash on February 8, 2017.

General Statutes (Rev. to 2017) § 21a-278 (b) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years . . . ."

The defendant argues that there was insufficient evidence to sustain his conviction because the state failed to prove beyond a reasonable doubt that he constructively possessed the cocaine. The state counters that the evidence and reasonable inferences drawn therefrom establish incriminating circumstances from which the jury could infer that the defendant knew of the presence and character of the cocaine and exercised dominion and control over it. We agree with the state.

"[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where, as here, the cocaine was not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses and to assure that proof exists beyond a reasonable doubt, it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Citation omitted; internal quotation

marks omitted.) *State* v. *Leon-Zazueta*, 80 Conn. App. 678, 683, 836 A.2d 1273 (2003), cert. denied, 268 Conn. 901, 845 A.2d 405 (2004).

In support of his claim of evidential insufficiency, the defendant relies on *State* v. *Nova*, 161 Conn. App. 708, 129 A.3d 146 (2015). In *Nova*, the police obtained a warrant to search both the defendant and an apartment building that the police believed was the defendant's residence. Id., 710. While surveilling the building in preparation for execution of the warrant, the police saw the defendant drive into the building's parking lot, exit the vehicle, and enter the apartment through the main entry door, which opened into the kitchen. Id., 710–11. The defendant then reemerged, ascending the external staircase of the balcony on the third floor, remained on the balcony for approximately one minute, and then descended from the balcony and returned to his vehicle. Id. When the police subsequently executed the search warrant on the apartment, they found drugs and drug paraphernalia in the kitchen and on the balcony. Id., 712. The search of the defendant revealed two cell phones but no cash or drugs. Id., 713.

In reversing the defendant's conviction, this court stated that "[i]t is undisputed that the defendant did not exclusively possess the apartment or make any incriminating statements. Thus, the question is whether the other circumstances were sufficiently incriminating to support an inference that the defendant constructively possessed the narcotics police discovered in the apartment." Id., 719. In its review of the record, the court determined that "there was no evidence that the defendant was observed carrying anything into the kitchen or onto the balcony, no evidence that he touched anything while in the kitchen or on the balcony, and no evidence that he left the kitchen or balcony with anything." Id., 722. Moreover, the court noted that it was speculative to conclude, "on the basis of the defendant's mere proximity to the packaging materials and his passage through the kitchen, that he controlled the cocaine found in the kitchen cabinets and garbage. The kitchen was a common area used by the apartment's occupants and was adjacent to the main entry door, requiring the defendant, like anyone entering the apartment, to pass through it." Id., 723. Moreover, "there was no compelling correlation between the defendant simply being in the apartment where drugs and paraphernalia later were discovered and the conclusion that he constructively possessed those narcotics and paraphernalia." Id., 722–23. This court thus concluded that "the defendant's presence in the kitchen and on the balcony established nothing more than a temporal and spatial nexus between him and the cocaine and packaging materials found in those areas." Id., 721. The court further emphasized that, although the defendant had access to the apartment over a nine month span, "the defendant's relationship to the contraband, not his relationship to

the apartment, is the proper focus of the constructive possession inquiry." Id., 725.

We are not persuaded that the facts in *Nova* compel a similar result here. First, as we have previously explained, the defendant's nonexclusive possession of the apartment, and the bedroom in particular, does not preclude a finding of constructive possession where "there are other incriminating statements or circumstances tending to buttress . . . an inference [of constructive possession]." (Internal quotation marks omitted.) *State* v. *Winfrey*, 302 Conn. 195, 211, 24 A.3d 1218 (2011); cf. *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986) ("[t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent"). In *State* v. *Winfrey*, supra, 211–13, for example, our Supreme Court concluded that the defendant was in constructive possession of contraband found in the console of his wife's vehicle, notwithstanding the presence of another passenger, on the basis of factors that made it more likely that the defendant, rather than the passenger or his wife, owned the contraband. See also *State* v. *Hill*, supra, 516 ("The phrase 'to exercise dominion or control' as commonly used contemplates a continuing relationship between the controlling entity and the object being controlled. Webster's Third New International Dictionary defines the noun 'control' as the 'power or authority to guide or manage.' ").

In considering what factors may reasonably manifest the exercise of dominion or control when a defendant is in nonexclusive possession of the premises where contraband is found, we find instructive our Supreme Court's decision in *State* v. *Butler*, 296 Conn. 62, 993 A.2d 970 (2010). In that case, the court recognized that, when a defendant is not in exclusive possession of a vehicle, evidence from which a jury reasonably can infer that a defendant is a narcotics trafficker, coupled with sufficient evidence connecting a defendant to the narcotics, may establish that a defendant exercised dominion and control over the narcotics. Id., 78–79. Specifically, the court observed that "there was significant evidence from which it was reasonable for the jury to infer that the defendant was a narcotics dealer. *Such an inference would also help support the further inference that the defendant had possessed the narcotics.* See *State* v. *Marshall*, 114 Conn. App. 178, 188, 969 A.2d 202 (evidence that defendant had sold narcotics from same vehicle to undercover agent relevant to dispel doubts about possession), cert. denied, 292 Conn. 911, 973 A.2d 661 (2009); *State* v. *Diaz*, 109 Conn. App. 519, 527, 952 A.2d 124 (claim of insufficient evidence to support possession of narcotics unavailing when '[t]he jury had before it ample evidence from which it could infer that the defendant was a drug seller and that his apartment was integral to that criminal enterprise'),

cert. denied, 289 Conn. 930, 958 A.2d 161 (2008); *State* v. *Riser*, 70 Conn. App. 543, 553–54, 800 A.2d 564 (2002) (discovery of $1532 and other evidence demonstrating that defendant was trafficking crack cocaine supported inference of possession of contraband)." (Emphasis added.) *State* v. *Butler*, supra, 79–80. The defendant in *Butler* was accompanied by two passengers in a rental vehicle that was stopped by the police for a motor vehicle violation. Id., 66–67. From their patrol car, the officers observed the defendant closing the center console of the vehicle, which subsequently was found to contain 21.5 grams of cocaine. Id. The Supreme Court held that evidence of that movement, in addition to evidence of $1369 in cash, several cell phones found on his person, and the fact that the defendant was operating a rental vehicle, was sufficient to demonstrate constructive possession. Id., 67, 79–80.

In the present case, the jury had before it a confluence of incriminating statements and circumstances that support the inference that the defendant was in a position of control over the narcotics and possessed the requisite mental intent. As we noted in part I A of this opinion, the evidence presented at trial was sufficient to establish the defendant's intention to maintain his dominion and control over the revolver found in the bedroom he shared with his wife. By the same token, the fact that the fully loaded revolver was in the defendant's bedroom was a relevant factor for the jury to consider in determining whether the defendant also intended to exercise dominion and control over the narcotics found there, as the jury had evidence before it that guns frequently are used by drug dealers to protect themselves, their cash, and their narcotics.[9] See, e.g., *State* v. *Butler*, supra, 296 Conn. 74 ("[w]e have often stated . . . that it is reasonable for police officers to suspect guns to be associated with illegal drug selling operations" (internal quotation marks omitted)); *State* v. *Mann*, 271 Conn. 300, 325, 857 A.2d 329 (2004) ("Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms," and "[f]ederal courts also have recognized this fact of life" (internal quotation marks omitted)), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). The evidence also established that the $2661 in cash discovered in the apartment bedroom not only was found in the same storage container as the revolver, but also was in denominations of five $100 bills; four $50 bills; ninety-six $20 bills; and several bills in smaller denominations. According to the testimony of Sergeant Joseph Flynn, those denominations were significant because crack cocaine typically is purchased in transactions of $20 at a time. With respect to the digital scale found in the basement in a bag with the defendant's clothes, Dirga testified that scales commonly are used to ensure that cocaine is accurately measured for packaging and distribution. Here, the cocaine found in the bedroom

drawer weighed 3.1 grams, which, when broken down into amounts typical for sale, amounted to $360 worth of crack cocaine. In addition to that cocaine, officers found two baggies with cocaine residue, one of which was located in a pair of pants matching the defendant's size and build.

In analyzing a claim of constructive possession when a defendant has nonexclusive possession of the premises, we reiterate that the bedroom, unlike the kitchen in *Nova*, is not a common space but an intimate area of a home. As such, a jury reasonably could conclude that, for purposes of assessing the intention to exercise dominion and control, access to the bedroom would ordinarily be limited to the defendant and his wife. Further, the most incriminating statements and circumstances relating to the conduct of someone involved in the sale of narcotics—such as the revolver that the defendant admittedly owned, the large amount of cash found in the same storage container as the revolver, the drug baggie found in a pair of men's pants matching the defendant's physical description, the digital scale found in the bag of the defendant's clothing, the two cell phones found on the defendant, and the evidence of the defendant's cash purchase of the Victory motorcycle—all implicate the defendant, rather than his wife. As in *Butler*, the cumulative effect of this evidence supports an inference that the defendant intended to exercise dominion and control over the narcotics and, therefore, constructively possessed the cocaine. See *State* v. *Slaughter*, 151 Conn. App. 340, 349–50, 95 A.3d 1160 (testimony about modus operandi of drug dealers coupled with defendant's conduct sufficient to establish constructive possession even though defendant's girlfriend was lessee of apartment where narcotics were found because there was no evidence to support belief that girlfriend knew of presence of drugs or was involved in sale of illicit drugs), cert. denied, 314 Conn. 916, 100 A.3d 405 (2014). We, therefore, conclude that the evidence before the jury was sufficient to support a finding that the defendant constructively possessed the cocaine found in the apartment.

C

The defendant also claims that the state presented insufficient evidence to support his conviction of risk of injury to a child in violation of § 53-21 (a) (1).[10] The state's theory at trial was that the defendant had exposed his twelve year old stepdaughter to a risk of injury because his revolver was loaded and accessible in the stackable drawer in the bedroom. On appeal, the defendant argues, inter alia, that the mere presence of a firearm hidden in a storage container does not constitute a situation in which a child is likely to be injured for purposes of § 53-21 (a) (1).

On our review of the record, we agree with the defendant. Moreover, the state concedes that it failed to pres-

ent sufficient evidence with respect to the risk of injury to a child conviction. For that reason, the defendant's conviction of risk of injury to a child cannot stand.

## II

As a final matter, the defendant claims that the court violated his right to compulsory process under the sixth amendment[11] by refusing to issue a capias for Yepes, who failed to appear at trial in response to a subpoena. The state concedes that the court mistakenly concluded that it could not issue a capias in the absence of in-hand service of the subpoena on Yepes. It nevertheless contends that the court's denial of defense counsel's request for a continuance to secure Yepes' testimony, which was predicated on the same compulsory process concern that animated his capias request, renders the capias issue academic, as the defendant cannot demonstrate that the court violated his right to compulsory process under the particular facts of this case. The state also argues, as an alternative ground of affirmance, that any violation of the defendant's right to compulsory process was harmless beyond a reasonable doubt. We agree with both of the state's arguments.

A capias is a vehicle to compel attendance at a judicial proceeding. See *Pembaur* v. *Cincinnati*, 475 U.S. 469, 472 n.1, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) ("[a] capias is a writ of attachment commanding [an] official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt"); *DiPalma* v. *Wiesen*, 163 Conn. 293, 298, 303 A.2d 709 (1972) ("[i]f one is not warranted in refusing to honor a subpoena and it is clear to the court that his absence will cause a miscarriage of justice, the court [is permitted to] issue a capias to compel attendance"). As one court has noted, it is "an extraordinary measure"; *Wright* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-15-4006830-S (January 18, 2019) (67 Conn. L. Rptr. 659, 660); that involves the arrest of the witness in question. See General Statutes § 52-143 (e). In light of the gravity of such action, Connecticut law is clear that the issuance of a capias is not mandatory but, rather, rests in the sole discretion of the trial court. The trial court "has the authority to decline to issue a capias when the circumstances do not justify or require it. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 33, 190 A.3d 851 (2018), cert. denied sub nom. *Greene* v. *Semple*, U.S. , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019). Our review of a court's ruling on a continuance request likewise is governed by the abuse of discretion standard. See *State* v. *Campbell*, 328 Conn. 444, 473, 180 A.3d 882 (2018) ("[t]here is no question but that the matter of a continuance is traditionally within the dis-

cretion of the trial judge which will not be disturbed absent a clear abuse" (internal quotation marks omitted)).

## A

To properly consider the defendant's claim regarding the alleged violation of his right to compulsory process, a detailed examination of the extensive procedural history of this case is necessary. During a pretrial hearing held on July 12, 2018, the court asked counsel whether they believed that trial could be completed within one week.[12] At that time, the prosecutor expressed confidence in his ability to conclude the state's case-in-chief in two days. Following defense counsel's representation of the defendant's witness list, the prosecutor indicated to the court that he had notified defense counsel on an earlier date that Yepes would not be available for trial. The prosecutor explained that, because Yepes was on vacation in Florida, he intended to call officers who witnessed what Yepes saw to testify at trial. When defense counsel indicated that he thought he could still subpoena Yepes in Florida, the prosecutor responded that Yepes was out of state for the month of July and reiterated that he had so apprised defense counsel on an earlier date.

On that same day, as well as during the court's advisement to venirepersons, the court stated that it anticipated evidence starting on July 16, 2018, and continuing for approximately one week, "plus or minus a day or two." The court further informed potential jurors that, although "nobody can really give you an end date . . . we anticipate about a week for all the evidence and the conclusion of the case."

During its case-in-chief, the state established that Officers Schreiner, Mark Lemieux, Dirga, and Yepes executed the search warrant on the apartment. Both Schreiner and Dirga testified that Yepes was on vacation in Florida for the month of July. Dirga also testified that he was present during the search of the apartment bedroom and had observed Yepes when he found the crack cocaine inside the bedroom dresser and the baggies containing cocaine residue in the pocket of the men's pants and on the bedroom floor.

At the end of the day on July 16, 2018, the court reviewed the remaining schedule with the jury and, on the basis of the prosecutor's representations, indicated that the state intended to conclude its case-in-chief on Thursday, July 19. On July 18, the state presented the testimony of six witnesses and then indicated that it likely would conclude its case-in-chief the next morning. On July 19, the state rested its case. At that time, the defendant moved for a judgment of acquittal, which the court denied.

Defense counsel then asked the court for a recess to contact his witnesses. Upon his return, defense counsel

informed the court that he was not prepared to begin the defendant's case until the next morning. Counsel, therefore, requested a continuance. Although the court acknowledged that the jury was aware that the case could "spill out" to the following week, after asking counsel whether he could secure a witness for that afternoon, the court ultimately granted the defendant's request to continue the case to the next day, July 20.

Prior to adjournment, the prosecutor asked the court to ask defense counsel "if he's going to need any of the police officers because what happens is, he subpoenas them . . . [t]hey cannot get a hold of [defense counsel], and then, they end up calling me to find out about whether or not they are required to be here . . . ." The prosecutor noted that three police officers who had been subpoenaed by the defendant to appear that morning had been released from their subpoenas.[13] For that reason, the prosecutor wanted to know whether those officers would be needed the next day, as their previous attempts to contact defense counsel had been unsuccessful. In response, defense counsel assured the court that he would "make personal phone calls to each and every one of them, to the chief of the police department, whatever it takes if they're saying they're having a problem reaching me." Court then adjourned at 11:33 a.m. on July 19.

The following day, defense counsel began his case by calling Leary, whose testimony concluded at 11:25 a.m. Defense counsel then informed the court that he "ha[d] several witnesses . . . coming at two o'clock" who were all law enforcement officers. When the court inquired as to whether counsel had a witness who could fill the gap before the afternoon recess, defense counsel replied: "I believe that [the prosecutor] represented that one of the subpoenaed witnesses, Detective Yepes, is not available?" In response, the prosecutor reiterated that the testimony at trial already had established that Yepes was currently out of state and would be for the entire month of July, and that the prosecutor previously had apprised defense counsel of that fact "quite some time ago." The court then recessed for ten minutes at 11:55 a.m. after asking defense counsel to contact his witnesses to determine whether any could testify before the 1 p.m. lunch recess. When the proceeding reconvened at 12:31 p.m., defense counsel represented to the court that he believed his witness was "on his way up" to the courtroom. At that time, the marshals indicated to the court that the witness in question was not in the building. The court thus adjourned for the lunch recess. Prior to doing so, the court instructed defense counsel to contact *all* of his witnesses during the lunch recess to ensure they were ready to testify "one after the other" beginning at 2 p.m. At that time, defense counsel represented to the court that he already had done so.

When the proceeding resumed after the luncheon

recess, the court asked defense counsel to call his next witness. Counsel then replied, "I'm not sure he's available but, at this time, the defense would call Detective George Yepes." The court immediately excused the jury and the following colloquy occurred:

"[The Prosecutor]: Your Honor, this is done very blatantly for effect before the jury.

"The Court: Well, I'm going to address that in a minute. . . . [Defense counsel], [i]f you are going to make—

"[Defense Counsel]: I'm sorry?

"The Court: If you're going to call a witness that you know that's not available—

"[Defense Counsel]: Well, my understanding was, he's coming back Thursday.

"[The Prosecutor]: No, no, no, no.

"[Defense Counsel]: Unless I go[t] that confused.

"[The Prosecutor]: That wasn't . . . the testimony."

The court then asked Attorney Corey Heiks, cocounsel for the defense, who had called Yepes as a witness, to address the issue. Heiks stated that defense counsel's "office has properly sent out subpoenas, one of which being Detective George Yepes. It's our understanding Detective Yepes would be coming back from Florida by Thursday. Here we are Friday, every reasonable inclination that he would be here and available. The Middletown Police Department accepted service . . . of the subpoena for him. . . . [The] defense's strategic purpose of the . . . order of witnesses that he was very imperative and we would like to call now because he was the supervisor. We heard testimony that all the officers were doing what Detective Yepes instructed them to do. [He] . . . and, I believe, it was Peck, they're the ones that are privy with the incident report, the only one, to my understanding, that has ever been made. We know two officers didn't bother making reports, and that's why, at this time, I feel that Detective Yepes would be available and we'd able to proceed forward."

In response, the prosecutor stated: "I told . . . [defense counsel] before the jury selection process even commenced that [Yepes] was away for the entire month of July in Florida, so he knew it. Do you know when they dropped off the subpoena for [Yepes], knowing that? This Monday, July 16th. Okay? And he—there was testimony from a witness who stated that [Yepes] was going to be out for the month of July. So, for them to then say, we heard he was coming back Thursday, is simply not true. . . . They knew he was gone for the month of July. There was testimony of that. I told [defense counsel] he would be gone for the month of July." The court asked defense counsel if he had in-

hand service for Yepes, and defense counsel replied that he did not and instead served the subpoena on the Middletown Police Department, which accepted service on his behalf. The court then asked defense counsel to call their next witness, and the defense called Detective Michael Fonda, who was present and testified.

Following Fonda's testimony, the defense called Schreiner as a witness, but Schreiner was not present. After the court excused the jury, defense counsel represented that Schreiner properly had been subpoenaed and was in the state but that efforts to contact him in order to secure his timely presence had been unsuccessful. Defense counsel thus asked the court to issue a capias for Schreiner. The court replied that it was unwilling to issue a capias in the absence of proof of in-hand service of the subpoena.[14] Defense counsel represented that a member of the police department had stated that he would accept service of the subpoena and "would inform everybody" of it. When the court asked if he had another witness, defense counsel responded, "[w]ell, actually, no. [Schreiner would] be the last witness, but he's not here and he refuses to come, I guess." The prosecutor then requested that the court ask defense counsel what method was used to contact Schreiner because the officer had testified at trial days earlier and "could have been apprised" of "when, approximately, he would be needed." Furthermore, the prosecutor reiterated that, "as I told you yesterday, I have had several officers say to me they could not get in touch with [defense counsel]." The court then stated that it was going to take a fifteen minute recess and instructed defense counsel to "do what you need to do to get the next witness in here if that's what you wish to do . . . ."

When court resumed, defense counsel represented that he had spoken to an officer at the Middletown Police Department, who was under the impression that Schreiner and Yepes were in the state and may be present at 4 p.m. that day. When defense counsel suggested continuing the case until the following Monday as one of the options moving forward, the court responded by recounting the proceedings thus far and emphasized that defense counsel had been on notice that the state was going to rest the day before, that the court already had given defense counsel a continuance for that day, and that defense counsel had assured the court that he had three witnesses who would take one hour each. The court also repeated its belief that it could not issue a capias without in-hand service of the subpoena and stated that, "[d]ropping a subpoena to the local police department, it may or may not be enough [in order] to issue a capias." Defense counsel then stated that he had "made every effort" and that he had "proof via e-mails, via phone calls . . . ." Defense counsel further assured the court that subpoenas had been issued after the court reminded him that proof of phone calls was

inadequate for a capias.

After the prosecutor noted that there was no corroboration of service, the court asked defense counsel if he had a copy of the subpoena that he issued to Schreiner. Defense counsel stated, "[y]es, I do." The court then demanded to see it. Instead of producing the subpoena, however, defense counsel stated that he could "produce phone records since [the prosecutor] is, basically, saying that I'm a liar." Defense counsel then offered to have the marshal come in and "tell exactly how she served, and who she served," to which the court replied: "[T]hat's not what I asked you. I asked you if you have a subpoena." Defense counsel then represented that he did have a subpoena "but not in my possession at this moment."

The court reiterated that it would like to see whether counsel had copies of the subpoena. Defense counsel responded, "okay," after which the record indicates there was a pause before counsel continued: "Your Honor, would e-mail be sufficient? If they give me copies from e-mail or they—[do you] want to see the actual hard copy?" Defense counsel then stated that "[a] marshal was not available to bring them today, but . . . is available next week . . . or I could drive back to my office. . . . We have copies there . . . ." In light of the foregoing, the court decided to adjourn for the weekend and informed defense counsel that it was his obligation to have his witnesses at court the following Monday. The court further instructed the parties to prepare written briefs on what options were available for the court if the defendant's witnesses were not present at that time.

When trial resumed on Monday, July 23, 2018, the court asked if the defense had any witnesses. Defense counsel replied that he would have witnesses only if Yepes was present and represented that Yepes, like Schreiner, had been lawfully subpoenaed.[15] The prosecutor at that time represented that a subpoena had been delivered to the Middletown Police Department seven days earlier, but that Yepes "was never notified of when he was supposed to be here" because "[h]e's been out of state." The prosecutor also informed the court that the state had secured the presence of Schreiner, whom the defendant requested to call days earlier, and asked the court to ask defense counsel if he intended to call Schreiner as a witness. Defense counsel indicated that he planned to call Schreiner after Yepes' testimony concluded. The court then asked defense counsel to make an offer of proof regarding Yepes' anticipated testimony. Defense counsel stated: "Well, [Yepes] is the one that everybody said he told them what to do and he is in charge and he signed off on everything. Nobody else has a report. Okay? Nothing else is involved in a report except for him. Okay? That's my offer of proof." When the court informed counsel that Yepes was not the officer who had authored the report, defense counsel

simply responded, "[o]kay." The court then asked defense counsel if Yepes' testimony "would be cumulative to what other Middletown police officers have already testified to," and counsel replied, "[m]aybe." The court then asked counsel if he was asking for a continuance, and defense counsel replied, "No. . . . I don't want a continuance. I want Detective Yepes."

When defense counsel then confirmed that he had another witness, the court asked counsel to call that witness. Defense counsel declined to do so, stating: "I am not calling a witness out of order. You can't—you can't force that." In response, the court again asked defense counsel if he was requesting a continuance, and defense counsel replied: "No. I'm asking for Detective Yepes to be here. If you want to continue the case until Detective Yepes is back from Florida, I'm fine with that." The court overruled that objection and ordered the defense to call its next witness, whereupon Schreiner took the witness stand.

Following Schreiner's testimony,[16] the court asked defense counsel if he had any further witnesses, and, in the presence of the jury, he replied: "Yes, I do. Detective Yepes." The jury once again was excused, and the court again asked defense counsel if he wanted a continuance. Defense counsel declined that offer, stating: "No. I'm asking for Detective Yepes to be present, as he should be under the law." The court again asked defense counsel if he had effected in-hand service of the subpoena; defense counsel replied that he had not but maintained that he was not required to do so under the rules of practice. The court at that time stated that it could not issue a capias for a witness who had not been served in hand.

When defense counsel thereafter informed the court that he had no witnesses other than Yepes, the court again asked for an offer of proof. Defense counsel replied: "All the officers involved in that investigation, all reported verbally to Detective Yepes, who was in charge. None of them have writings." When pressed by the court, defense counsel stated that he was unsure who had written the incident report,[17] but he believed that Dirga and Yepes may have signed it.

The court at that time recounted for the record the extensive procedural history underlying the issue, emphasizing that defense counsel had been aware prior to trial, and before the subpoena was issued, that Yepes was out of state and that defense counsel had the opportunity to cross-examine the other police officers involved in the search of the apartment. The court noted that, on July 9, 2018, "we had a hearing on motions" at which the prosecutor "informed the parties that [Yepes] was out of state. . . . Evidence commenced . . . on [July] 16. Tuesday, we took a recess and . . . Thursday, July 19, the state rested in the morning, one witness. I asked [defense] counsel that morning . . . how

many witnesses [he] intended to call. I was told three witnesses. I asked how long were those witnesses going to last, and I was told about an hour each, not including what the state would cross-examine. . . . Counsel indicated that he needed a continuance to get his witnesses. I granted that continuance. . . . At approximately twelve o'clock that day of July 19, I granted [another] continuance for the defense to begin [its case on] Friday morning. Friday, the defense had one witness in the morning. I asked where the other witnesses were. [Defense counsel was] not aware of where they were. I granted a continuance until two o'clock where [the defendant] produced one witness. At that time, the defense still did not have any other witnesses. So, at 3 p.m., I granted [an additional] continuance [until the following Monday] for the defense to produce its other witnesses. This morning, [the defense] produced one witness who, really, had no testimony. The only remaining witness from this defense is [Yepes], a witness [who] is in Florida, was in Florida by the time . . . the . . . subpoena was issued [and] continues to be in Florida. . . . Counsel for the defense had had ample opportunity to cross-examine all of the other police officers involved [in the May 31, 2017 search of the apartment], by their own admission.

"The defense feels that it's necessary to call [Yepes, who] . . . I would classify as a cumulative witness. I've asked the defense if they're asking for another continuance. They're not asking for another continuance, but [are insisting on the testimony of Yepes, who] is not in the state of Connecticut. So, then, the question is, how do we proceed."

The court then suggested that the only option for the defendant to secure Yepes' testimony would be to ask for a continuance and reiterated that "[i]t's 10:30 a.m. [The defendant has] called one witness who, really, had nothing to say." Defense counsel at that time stated that "the only way to resolve this properly, for [the defendant] to get a fair trial, is to continue the case when Detective Yepes is available." The prosecutor objected to that continuance request on the grounds that (1) the state had notified defense counsel prior to trial that Yepes was going to be in Florida for the month of July and defense counsel had been afforded ample time to secure his attendance on or before July 23, (2) Yepes' proffered testimony would be cumulative given that other Middletown police officers already had testified as to their observations of Yepes, (3) counsel had failed to produce a marshal to testify as to when the subpoena had been served, (4) there was a lack of evidence on the return of process on the subpoena, (5) a continuance would disrupt the trial because Yepes was not scheduled to return from Florida until weeks later on August 6, 2018, and (6) it was likely that jurors would become unavailable given the parameters they had been given regarding the approximate length of

the trial.

The court thereafter denied defense counsel's request for a continuance. In so doing, the court emphasized that counsel already had been afforded multiple continuances in order to produce his witnesses, his request was untimely, the probable duration of the continuance pending Yepes' return would be too long, Yepes' testimony, as proffered, "would be cumulative" of evidence already before the jury, and that counsel had had the opportunity to cross-examine and confront six to eight police officers. The court further concluded that the denial of the request for a continuance "would not impair the defendant's ability to defend himself with respect to these matters."

After the state's rebuttal witness and the defendant's surrebuttal witness had finished testifying, defense counsel again indicated for the record that he wanted to call Yepes. The evidence thereafter was submitted to the jury, which returned a verdict of guilty, and this appeal followed.

### B

With that context in mind, we turn to § 52-143, which governs the issuance of a capias in this state.[18] That statute "authorizes the trial court to issue a capias to compel the appearance of a witness who fails to appear without justification. The statute does not, however, make it *mandatory* for the court to issue a capias when a witness under subpoena fails to appear; issuance of a capias is in the discretion of the court . . . [which] has the authority to decline to issue a capias when the circumstances do not justify or require it. . . . Judicial discretion is always a legal discretion, exercised according to the recognized principles of equity. . . . [T]he action of the trial court will not be disturbed on appeal unless it acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Emphasis in original; internal quotation marks omitted.) *State* v. *Payne*, 40 Conn. App. 1, 18, 669 A.2d 582 (1995), aff'd, 240 Conn. 766, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 849 A.2d 760 (2004). At the same time, if the trial court "never exercised any discretion because it believed its authority to do so was lacking," our review on appeal is plenary. (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 238, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017).

### 1

Relying on *State* v. *Burrows*, 5 Conn. App. 556, 500 A.2d 970 (1985), cert. denied, 199 Conn. 806, 508 A.2d 33 (1986), the defendant argues that the court improperly declined to issue a capias in the absence of in-hand

service of Yepes.[19] Although he acknowledges that our review of such claims generally is governed by the abuse of discretion standard, the defendant maintains that, under *Burrows*, the court's mistake of law effectively obviates that standard of review because the court could not have exercised any discretion when it believed it lacked the authority to do so. In response, the state concedes that in-hand service is not required but argues that, under the particular circumstances of this case, the issuance of a capias alone, without the granting of a continuance for the time needed to enforce it, would have been a futile act. Furthermore, because the defendant has not challenged the propriety of the court's denial of his request to continue the trial until Yepes returned to Connecticut several weeks later, which request was intertwined with the capias issue, the state submits that the defendant cannot establish a violation of his right to compulsory process. On the particular facts of this case, we agree with the state.

The right to compulsory process is memorialized in the sixth amendment. As our Supreme Court has explained, "[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Internal quotation marks omitted.) *State* v. *Tomas D.*, 296 Conn. 476, 497, 995 A.2d 583 (2010), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). In *Tomas D.*, our Supreme Court emphasized that the right to compulsory process is *not* unqualified, and instructed that "a defendant may not successfully establish a violation of his rights to present a defense and to compulsory process without first taking reasonable steps to exercise those rights." Id., 498. More specifically, the court observed that, "[t]o exercise his sixth amendment compulsory process rights diligently, a defendant is required to utilize available court procedures, such as the issuance of subpoenas, as well as requests for continuances or material witness warrants that may be reasonably necessary to effectuate the service process." Id.; see also *State* v. *Lubesky*, 195 Conn. 475, 478–80, 488 A.2d 1239 (1985) (rejecting compulsory process claim arising from inability to find state witness who already had testified because defendant failed to request continuance or move for mistrial); *Schwartzmiller* v. *State*, 108 Idaho 329, 330–31, 699 P.2d 429 (App. 1985) (defendant's "diligence in exercising his sixth amendment right" is "relevant factual [inquiry]"), review denied, Idaho Supreme Court, Docket No. 15231

(June 20, 1985); *State* v. *Timblin*, 254 Mont. 48, 51, 834 P.2d 927 (1992) (compulsory process inquiry includes consideration of "defendant's diligence in exercising [s]ixth [a]mendment rights"). In concluding that the defendant's right to compulsory process was not violated, our Supreme Court held that the failure to seek a continuance to secure the live testimony of a witness is "a significant factor in concluding that the defendant's federal compulsory process rights have not been violated . . . ." *State* v. *Tomas D.*, supra, 500.

In this case, the record reveals that, although the court articulated its mistaken belief that in-hand service of the subpoena was required to effectuate a capias, the court's consideration of the defendant's sixth amendment right to compulsory process—specifically, the right to offer testimony of certain witnesses and to compel, if necessary, their attendance—was intertwined with its deliberation on whether to grant a continuance until Yepes returned to Connecticut. The court specifically found that "[t]he only remaining witness from this defense is a witness that is in Florida, was in Florida by the time . . . the . . . subpoena was issued, [and] continues to be in Florida. . . . Counsel for the defense had had ample opportunity to cross-examine all of the other police officers involved . . . in the [May 31, 2017 search of the apartment], by their own admission. . . . The defense feels it is necessary to call [Yepes, who] . . . I would classify as a cumulative witness. I've asked the defense if they're asking for another continuance. They're not asking for another continuance, but the witness is not in the state of Connecticut. So, then, the question is, how do we proceed." The court then stated that the only option for the defendant to be able to produce Yepes would be to ask for a continuance and reiterated that "[i]t's 10:30 a.m. We've called one witness who, really, had nothing to say."

Having previously insisted on the issuance of a capias, defense counsel responded that "the only way to resolve this properly, for [the defendant] to get a fair trial, is to continue the case when Detective Yepes is available."[20] Following the state's objection to another continuance, the court then considered the factors set forth in *State* v. *Godbolt*, 161 Conn. App. 367, 374–75, 127 A.3d 1139 (2015), cert. denied, 320 Conn. 931, 134 A.3d 621 (2016).[21] The court emphasized that the defendant already had been afforded two continuances in order to produce his witnesses; his request was untimely; the probable duration of the continuance until Yepes' return weeks later would be too long; Yepes' testimony, as proffered, "would be cumulative" of evidence already before the jury; and the defense had the opportunity to cross-examine and confront one-half dozen other police officers. Accordingly, the court concluded that the denial of defense counsel's request for a continuance "would not impair the defendant's ability to defend himself with respect to these matters"

and, thus, denied the request.[22]

On our exhaustive review of the record, we conclude that the court properly proceeded to consider the issue of whether a continuance of two weeks was necessary in light of the right to compulsory process concerns raised by defense counsel and his repeated attempts to call Yepes as a witness. The record indicates that the court had before it uncontroverted evidence that Yepes had been out of state at all relevant times and would remain so for another two weeks until August 6, 2018. In light of Yepes' unavailability, and mindful of the extensive factual and procedural history regarding the issue, the court concluded that a continuance was the only viable option for securing his presence as a witness. The court further determined, despite the compulsory process concerns articulated by defense counsel, that a continuance was not warranted under the facts of this case. Given the particular procedural history of this case, the court's findings of fact, which were based on sworn testimony before it with respect to Yepes' unavailability, the interwoven nature of defense counsel's capias and continuance requests, and the fact that the defendant has not challenged the court's decision denying his request for a continuance, we conclude that the defendant has not demonstrated that his right to compulsory process was violated in the present case.

2

Even if we were to conclude otherwise, the defendant could not prevail. The state alleges, as an alternative ground of affirmance, that any violation of the defendant's right to compulsory process stemming from the court's refusal to issue a capias did not constitute harmful error. We agree.

In *State* v. *Burrows*, supra, 5 Conn. App. 559–60, this court held that the state bears the burden of proving that a violation of a defendant's right to compulsory process was harmless beyond a reasonable doubt. We conclude that the state has met that burden in this case.

"Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the [witness] in the prosecution's case, whether the [testimony of the witness] was cumulative, the presence or absence of evidence corroborating or contradicting the [witness] . . . and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [witness] on the trier of fact and the result of trial." (Internal quotation marks omitted.) *State* v. *Quail*, 168 Conn. App. 743, 762–63, 148 A.3d 1092, cert. denied, 323 Conn. 938, 151 A.3d 385 (2016).

First, with respect to the importance of Yepes' testimony, we are persuaded that Yepes' testimony would have been cumulative of evidence that was already before the jury. Although Yepes was the officer who found the cocaine, Dirga testified on direct examination that he personally observed Yepes when he discovered the cocaine in the upper left dresser drawer, and Dirga was cross-examined by the defense. While Yepes was present when the defendant confessed that the gun was his, the defendant's confession was witnessed by other officers whom the state called to testify. Lemieux and Peck testified at trial that they heard the defendant's confession as well. Defense counsel, when questioned by the trial court about the materiality of Yepes' testimony, also conceded that Yepes' anticipated testimony might have been "cumulative to what other Middletown police officers have already testified to." In light of the foregoing, while denying the defendant's request for a continuance on July 23, 2018, the court made a finding that Yepes was a witness whose testimony would have been cumulative of other evidence already before the court. Accordingly, this factor weighs in favor of the state.

Next, with respect to the strength of the prosecution's case, we first conclude that the refusal to issue a capias or grant defense counsel a continuance to secure Yepes' testimony was harmless with respect to the criminal possession of a revolver charge because the defendant had confessed to the police that the gun belonged to him.[23] It is well established that "[a] confession, if sufficiently corroborated, is the most damaging evidence of guilt . . . and in the usual case will constitute the overwhelming evidence necessary to render harmless any errors at trial." (Internal quotation marks omitted.) *State* v. *Williams*, 202 Conn. App. 355, 370, 245 A.3d 830, cert. denied, 336 Conn. 917, 245 A.3d 802 (2021); see *State* v. *Iban C.*, 275 Conn. 624, 645, 881 A.2d 1005 (2005); see also *Arizona* v. *Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) ("[a] confession is like no other evidence"). With respect to the possession with intent to sell conviction, as discussed in part I B of this opinion, the jury reasonably could have found that the defendant had constructive possession of the cocaine that the police found in the upper left dresser drawer, particularly because the officers also discovered in the defendant's bedroom a drug baggie in a pair of men's pants matching the defendant's physical description that tested positive for cocaine residue. In addition, the officers found other evidence commonly associated with drug dealing during their search of the apartment, including the defendant's revolver, the large amount of cash in various denominations that was located in the same storage container as the revolver, the digital scale in a bag with the defendant's clothes, the presence of a pit bull, and the two cell phones found on the defendant.

Finally, we conclude that the potential impact of Yepes' testimony was largely inconsequential. In *State* v. *Burrows*, supra, 5 Conn. App. 560, this court determined, in considering the defendant's alibi defense, that "the expected testimony of the witness [for whom the court refused to issue a capias] . . . loom[ed] as a large exculpatory element in the trial of the defendant." As a result, this court concluded that the absence of the witness' testimony would have had an impact on the trial and, thus, constituted harmful error. See id. Unlike in *Burrows*, the defendant here never proffered that Yepes' testimony would undermine the state's evidence against him. Indeed, given that Yepes discovered the cocaine and heard the defendant confess that the gun was his, the evidence in the record before us indicates that, had Yepes been compelled to testify, his testimony likely would have been adverse to the defense, and the defendant never articulated to the court a reason for it to believe otherwise. Accordingly, we conclude that the state has demonstrated that any violation of the defendant's right to compulsory process stemming from the court's refusal to issue a capias was harmless beyond a reasonable doubt.

The judgment is reversed only as to the conviction of risk of injury to a child and the case is remanded with direction to render judgment of acquittal on that count and to resentence the defendant accordingly; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] We note that the legislature amended § 21a-278 since the events at issue. See Public Acts 2017, No. 17-17, § 2. For convenience, all references to § 21a-278 in this opinion are to the 2017 revision of the statute.

[2] For the possession with intent to sell conviction, the court sentenced the defendant to twenty years of incarceration, execution suspended after twelve years, plus five years of probation. The court also sentenced the defendant to concurrent ten year terms of incarceration on the criminal possession of a revolver and risk of injury to a child counts.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] At trial, the parties stipulated that the defendant had a prior felony conviction.

[5] Sergeant Joseph Flynn testified at trial that pit bulls are favored by drug dealers in order to guard their product when it is unattended.

[6] Sergeant Frederick Dirga testified that, in Middletown, crack cocaine sells for $10 for 0.10 grams and that the crack cocaine found in the apartment had a street value of approximately $360.

[7] Dirga testified on direct examination that drug dealers usually have two cell phones—a personal phone and one used for conducting business.

[8] The defendant's theory at trial was that he was not living in the apartment at the time of the search and that the expensive items in question were gifts bought for him by Leary. Leary testified that, in May, 2017, the defendant was living with her. She also testified that, after a tractor-trailer accident, which resulted in the death of her fiancé and two children in 2014, she received a substantial amount of money, became "very wealthy," and would "spoil" the defendant with expensive gifts. For example, she claimed that she gave the defendant $5000 in cash on May 1, 2017. Leary also testified that she bought the defendant a Victory Magnum motorcycle, as well as the Michael Kors watches found during the search of the defendant's apartment.

The prosecution countered this testimony by calling Peck as a rebuttal witness, who testified that the police executed a search warrant on Leary's residence the same day that they searched the defendant's apartment and did not find any men's clothing in her residence. During closing arguments, the prosecution also argued that Leary was biased and that her testimony about the gifts was not credible because she was the defendant's girlfriend, they were in a sexual relationship, and she admitted on cross-examination that she wanted to have children with the defendant.

To the extent that the defendant relies on Leary's testimony in his sufficiency of the evidence claims, we note that the jury was under no obligation to credit Leary's testimony. "Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *State* v. *Whitnum-Baker*, 169 Conn. App. 523, 527, 150 A.3d 1174 (2016), cert. denied, 324 Conn. 923, 155 A.3d 753 (2017). On appeal, for a sufficiency of evidence claim, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Capasso*, supra, 203 Conn. App. 339.

[9] Sergeant Joseph Flynn testified that the purpose of a firearm in the sale of narcotics was "to protect [the dealer] . . . [his] product, [and his] money . . . ."

[10] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the . . . health of such child is likely to be injured . . . shall be guilty of . . . a class C felony . . . ."

[11] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." "[T]he sixth amendment [right] to compulsory process [is] made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 593, 175 A.3d 514 (2018).

[12] The record indicates that counsel were reminded by e-mail that the court would be adhering to the original trial schedule, with voir dire commencing on July 11, 2018, and evidence beginning on July 16, 2018 through July 20, 2018, or until a verdict was reached.

[13] Those officers were Peck, Dirga, and Lemieux.

[14] In a colloquy with defense counsel, the court also explained the significance of a capias:

"The Court: If you're asking the court to arrest somebody—

"[Defense Counsel]: Not arrest him, just order him here.

"The Court: Well, that's what a capias is."

[15] Defense counsel also indicated that he had prepared a brief "on subpoenas . . . and how a police officer is supposed to be served." In response, the court stated: "That's not really what I asked to be briefed. What I asked to be briefed is, if you did not have any witnesses present today, how should we proceed with trial?" Defense counsel then responded by suggesting that the court consider entering a missing witness nolle as to Yepes; the court responded that it did not have the discretion to do so.

[16] The sum and substance of Schreiner's testimony in the defendant's case-in-chief amounted to confirmation that Yepes was in charge of the investigation and that Schreiner believed that Yepes currently was out of state on the basis of what Yepes had told him before his vacation.

[17] The incident report in question was not admitted into evidence and is not part of the record in this appeal.

[18] General Statutes § 52-143 (e) provides in relevant part: "If any person summoned by . . . any public defender . . . fails to appear and testify, without reasonable excuse . . . the court or judge, on proof of the service of a subpoena containing the statement as provided in subsection (d) of this section . . . may issue a capias directed to some proper officer to arrest the witness and bring him before the court to testify."

[19] In *Burrows*, this court concluded that "the trial court erred when it ruled it had no power to issue a capias because of the admitted lack of in-hand service of the intended witness." *State* v. *Burrows*, supra, 5 Conn. App. 560.

[20] Notwithstanding the requirement articulated in *State* v. *Tomas D.*, supra, 296 Conn. 498, 500, that a defendant must take reasonable steps to exercise the rights to present a defense and compulsory process, including the request

for a continuance, defense counsel in the present case subsequently characterized the court's action as "forcing [him] to . . . ask for a continuance."

[21] In *State* v. *Godbolt*, supra, 161 Conn. App. 367, this court stated: "A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis. . . .

"Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . . We are especially hesitant to find an abuse of discretion where the court has denied a motion for continuance made on the day of the trial. . . .

"Lastly, we emphasize that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Internal quotation marks omitted.) Id., 374–75.

[22] The defendant has not challenged the propriety of that determination in this appeal.

[23] In this appeal, the defendant has not raised any claim regarding that confession.

---